POTTS RUN COAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 26274, 30358.   Promulgated February 24, 1930.

*A. M. Liveright, Esq.,* for the petitioner.
*Arthur Carnduff, Esq.,* and *S. B. Anderson, Esq.,* for the respondent.

1

4

OPINION.

MARQUETTE: The first and second issues raised by the pleadings herein are as to the amounts that should be included in the petitioner's invested capital on account of the property acquired by it from James Kerr in 1903, and the proper basis for computing the allowances for depletion of the coal in place included in that property. These issues present phases of a single problem and they will be discussed together.

The respondent has determined that the land acquired by the petitioner from James Kerr had a value at that time of $86,000, of which $61,000 represented the value of the coal and $25,000 the value of the surface land, and he has allowed depletion computed on that basis. It also appears that the respondent included the entire property in the petitioner's invested capital at the amount of $99,500, as of the date it was paid in. While the evidence does not show a higher value for the surface land than that determined by the respondent, it does establish to our satisfaction that the fair market value of the property conveyed to the petitioner by Kerr, including coal and surface land, the town of Boardman, railway sidings and tipples, was at least $400,000, and that the fair market value of the coal and surface land was $320,775. The allowance for depletion of the coal should, therefore, be computed on a basic value of $295,775, beginning at the date the property was conveyed to the petitioner, and the entire property should be included in the petitioner's invested capital as of the date of acquisition at $400,000, with proper adjustment for the bonds in the amount of $185,000 which were issued to Kerr in part payment for the property.

The respondent has also included in the petitioner's invested capital for the years 1918, 1919, and 1920 the amount of $150,000 on account of the 1,500 acres of coal land that it purchased from the widow of James Kerr in 1917 for $150,000 par value of its capital stock. The respondent has amended his answer herein and now asks that the amount to be included in invested capital on account of this coal land be reduced to $75,000, for the reason that the land was acquired by James Kerr in 1906 or 1907 at a total cost of not more than $75,000. On this issue it is incumbent upon the respondent to show by competent evidence that he erred in including the

property in question in the petitioner's invested capital at $150,000, and in our opinion he has wholly failed to meet that burden. The petitioner purchased the property from Mrs. Kerr in 1917 and not from James Kerr in 1906 or 1907. The amount to be included in the petitioner's invested capital on account of this property is its fair market or actual cash value at the time it was conveyed to the petitioner in exchange for shares of stock, and the fact that it was purchased by Kerr some years before for $75,000 falls far short of establishing that it was not worth $150,000 in 1917. The respondent's claim is denied.

The next issue also relates to the petitioner's invested capital. The petitioner claims that in the years 1909 and 1913 it arbitrarily, by the book entries as set forth in the findings of fact, reduced its invested capital by the amounts of $62,334.96 and $96,020.61, respectively. The petitioner is clearly in error in its contention relative to the effect of the entry in 1909 in the amount of $62,334.96. The evidence shows that there were at that time on the petitioner's books credits or accounts payable to James Kerr, T. H. Watkins, and C. D. Simpson in the amounts of $31,167.30, $15,584.01, and $15,583.65, respectively, a total of $62,334.96. An entry was made on the petitioner's journal debiting the estate of James Kerr with $31,167.30, T. H. Watkins account with $15,584.01, and C. D. Simpson account with $15,583.65, and crediting the petitioner's property account with $62,334.96. The effect of this entry was to reduce the petitioner's property account by $62,334.96 and to make a corresponding reduction of its accounts payable, but it did not affect the petitioner's invested capital as shown by its books.

With respect to the amount of $96,020.61 covered by the entry of June, 1913, we are of opinion that the petitioner's contention is well taken. The circumstances under which this entry was made are fully set forth in the findings of fact and need not be restated here. The entry appears to have been an arbitrary charge-off, and it resulted in decreasing the petitioner's property account and its surplus and therefore reduced its invested capital by the amount of the charge-off. The amount charged off should be restored to the petitioner's invested capital.

The next question is whether the amounts credited by the petitioner in the taxable years involved herein to its workmen's compensation insurance reserve are proper deductions from gross income. Under the laws of Pennsylvania the petitioner was required to make provision for payment of workmen's compensation insurance. Three courses were open to the petitioner—(1) to insure in the State Workmen's Insurance Fund; (2) to insure in any insurance company authorized to insure such liability in the State of Pennsylvania, or

(3) to obtain exemption from the requirement of taking out insurance to cover the whole or any part of its liability to pay compensation, by satisfying the Bureau of its financial ability to pay the compensation provided by the statutes. The petitioner applied for and was granted such exemption and it thereupon set up a reserve fund on its books to cover any liability for compensation to its employees that might arise. Setting up the reserve was no doubt good business policy, but it was entirely voluntary on the part of the petitioner. The reserve was a safeguard against contingent future liability and nothing more. This Board has on numerous occasions held that additions to such reserves are not deductible from income and we find no reason for changing the views heretofore expressed. See *Pan-American Hide Co.*, 1 B. T. A. 1249; *Greenville Coal Co.*, 3 B. T. A. 1323; *Spring Canyon Coal Co.*, 13 B. T. A. 189.

The next issue relates to the disallowance as a deduction for expenses of the cost of mine machinery and equipment. In 1919 the amount so expended by the petitioner was $15,740.27, of which the respondent allowed $6,694.64, and disallowed $9,045.63, which was the cost of mining machines. In 1920 the expenditures for machinery and equipment amounted to $12,260.08 and they were all disallowed by the respondent. The mining machines and the other equipment purchased in 1920 had a useful life of several years. While this new machinery may not have increased the amount of coal produced, some of it did reduce the cost of production. This Board has on several occasions passed upon the exact question presented here and has held that expenditures such as we are now considering are not deductible. See *Union Collieries Co.*, 3 B. T. A. 540; *Kirk Coal Co.*, 3 B. T. A. 755; *White Ash Coal Co.*, 10 B. T. A. 942. We adhere to those decisions and sustain the respondent's determination.

The petitioner expended $26,473.43 in 1918 in constructing houses for the use of its miners. This construction was necessary because of war conditions in order to keep up the coal output. In 1920, $6,000 more was expended for "repairs" to these or other houses. The "repairs" consisted in part of replacing temporary foundations with permanent ones, and in putting on new roofs. The petitioner contends that the respondent erred in disallowing as deductible expenses the cost of the houses in 1918 and the cost of repairs in 1920.

No attempt was made to amortize the cost of the houses under the Revenue Acts of 1918 and 1921. The houses were used by the petitioner for several years after they were erected in 1918 and, although they are not at present in use, they are still standing and, inferentially at least, they are usable in case of need. In our opinion the respondent correctly determined that such building cost should be capitalized and an appropriate depreciation rate applied. As there

8

is no complaint that the rate allowed was inadequate for depreciation, the respondent's determination respecting this point is sustained.

We are also of opinion that the respondent correctly disallowed as expense the item of $6,000 for repairs to the houses in 1920. This Board has held in *Georgia Car & Locomotive Co.*, 2 B. T. A. 986, that the cost of a new roof upon a building used in the taxpayer's business was a capital expenditure not deductible as a business expense; a like holding appears in *Cotton Concentration Co.*, 4 B. T. A. 121, and we adhere to those decisions. The house foundations which the petitioner put in place in 1920 were replacements of the temporary foundations used when the houses were built two years previously. The later ones were of more permanent character, with useful lives of more than one year. Properly, their cost is part of the original building costs and should be capitalized as such. Although some of the expenditures made in connection with the houses in 1920 may have been for repairs the cost of which is deductible, there is no evidence as to the amount thereof. In the absence of such evidence we are unable to determine that any amount should be deducted. The determination of the respondent is, therefore, approved.

No evidence was offered respecting the loss from bad debts alleged to have occurred in 1920. Therefore, the respondent's disallowance of this item as a deduction is sustained.

In the petition filed in Docket No. 26274 it is alleged that the petitioner's tax liability for the year 1917 is in controversy. The deficiency letter shows, however, that the respondent has not determined any deficiency for the year 1917 and the petition, in so far as it relates to that year, is dismissed.

*Judgment will be entered under Rule 50.*