GEORGE A. HUNT, JR. and CECILE C. HUNT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hunt v. Commissioner
Docket No. 8150-76.
United States Tax Court
T.C. Memo 1978-150; 1978 Tax Ct. Memo LEXIS 365; 37 T.C.M. (CCH) 646; T.C.M. (RIA) 780150; April 18, 1978, Filed Michael D. Annis, for the petitioners. William R. McCants, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $47,054.74 in petitioners' 1972 Federal income tax. By an amendment to his answer, respondent alleged that the deficiency was actually $65,824.44 and that a $3,291.22 addition to tax is due under section 6653(a). [1]/ Respondent has conceded one issue, and the issues remaining for decision are as follows: 1. Whether the proceeds from the sale of landfill removed from a parcel of land owned by petitioners should be treated as a reduction in their basis for the land. 2. If issue 1 is answered in the negative, whether petitioners are entitled to cost depletion under section 611(a) in respect of the landfill removed from *368 a natural deposit of sand located on the property. 3. If issue 2 is answered in the negative, whether petitioners are entitled to percentage depletion under section 613 in respect of the sand excavated and sold from the property.
4. Whether income derived from a peat operation was properly attributable to petitioners or to their wholly owned corporation, Jasmine Plaza, Inc.
5. Whether any part of the underpayment of taxes "is due to negligence or intentional disregard of rules and regulations" within the meaning of section 6653(a). FINDINGS OF FACT 1. General
Petitioners George A. Hunt, Jr., and Cecile C. Hunt, husband and wife, were legal residents of Clearwater, Florida, when they filed their petition. Petitioners filed a joint Federal income tax return for 1972 with the Director, Southeast Service Center, Chamblee, Georgia. 2. Landfill Sales Income Issue
On November 26, 1971, petitioners acquired approximately 30 acres of land south of Tarpon Springs, Florida, known as the Estes-Mahon tract (sometimes referred to herein as the tract) for a total consideration of $95,291.46. The property was located approximately 1,000 feet from a paved highway and *369 was accessible only by way of a dirt road. The tract, which consisted of three subparcels, was bordered on the north and south by small poorly kept houses, on the west by railroad tracks, and on the east by undeveloped land. One parcel of approximately 6 acres, located to the west of the access road, was low and swampy. The eastern subparcel, approximately 4 acres in area, was relatively flat. The center section of approximately 20 acres was high rolling land.The southern half of this center section (south half) was thickly wooded. A prominent hill covered with dead or diseased citrus trees was situated on the center section's north half (north half). This hill was composed of high-grade yellow sand which had economic value for use as landfill. Since the early 1960's, George A. Hunt, Jr. (hereinafter petitioner), was engaged in various land development ventures. Until March 1972, he was president and chairman of the board of directors of George Hunt, Inc. (the company), a construction firm engaged in building roads, residential subdivisions, shopping centers, and other commercial projects. During 1972, the company was engaged in the construction of a Ramada Inn campsite *370 approximately 2 miles from the Estates-Mahon tract. Landfill was needed in completing this construction. Petitioner's primary purpose in purchasing the Estes-Mahon tract was to obtain a source of needed landfill. He knew he could remove sand from the north half of the tract and sell the sand to the company for use as landfill at the Ramada Inn construction site. Petitioner could not have obtained a county permit for a landfill pit operation on the Estes-Mahon tract. In order to obtain a permit to remove the sand, petitioner submitted to the county a plan for subdividing the tract for residential use. The plan was approved in January 1972, and it permitted petitioner to excavate the hill to certain authorized levels. Petitioner's primary intent in purchasing the Estes-Mahon tract was to excavate and sell sand from the center subparcel, but he was also aware that the subparcel of land east of the access road was suitable for residential development. To develop and subdivide the center section where the hill was located required a substantial amount of excavation because the hill was so high sewerage facilities could not be installed except at prohibitive costs. The approved *371 subdivision plan called for neighborhood lanes terminating in cul-de-sacs in the south half of the center subparcel. Local county ordinances restricted tree removal, and the plan did not authorize wholesale excavation of this heavily wooded area. Sand deposits underlying that portion of the property, except for the lanes and cul-de-sacs, were not commercially recoverable. Herbert McNairy, an engineer with the company when petitioner acquired the tract, initially estimated that there were approximately 100,000 cubic yards of sand available on the center parcel. It was his opinion, however, after studying the approved subdivision plan and a topographical map of the tract, that the proposed excavation of the north half of the center parcel would yield 92,280 cubic yards of sand and the areas subject to excavation in the south half would yield additional sand. During 1972 and 1973, petitioner excavated sand from the tract. Most of the excavated sand was sold to the company for use at the Ramada Inn campsite. Equipment owned by the company was used to load the sand on trucks owned by R. Smith & Sons (Smith), and Smith's trucks transported the sand to the construction site. The company *372 paid Smith 30 cents per cubic yard for hauling and 95 cents per cubic yard for the sand. Smith in turn gave petitioner checks made payable to George Hill Fill Dirt (GHFD) on the basis of a price of 95 cents per cubic yard for the sand removed from the Estes-Mahon tract and delivered to the Ramada Inn campsite. During 1972, Smith's payments to GHFD totaled approximately $90,800 (without regard to $3,668.79 sales tax). In April 1973, petitioner received an additional $20,000 from Smith on the sale of sand. On occasion, petitioner sold sand from the tract to customers other than the company. A major part of these sales occurred when a dirt fill pit owned and operated by the company was closed and the company's customers came to the tract for sand. In making these sales petitioner normally charged 60 cents or 75 cents per cubic yard. In 1972 petitioner received $12,590.96 from these sales. Among other factors, the price of landfill is dependent upon whether the buyer or seller furnishes the loading equipment, which party pays for transporting the landfill to the construction site, the distance from the landfill to the construction site, the quality of the landfill, and the amount *373 of landfill purchased. In September 1973, petitioner transferred the tract to George Hunt, Inc., in exchange for a one-half undivided interest in two-thirds of a parcel of property known as the "Tarpon Avenue Property" located on the northwest corner of highway No. 19 and Tarpon Avenue in Tarpon Springs. At the time of this exchange, the major portion of the excavation on the north half of the Estes-Mahon tract had been completed. However, excavation of the sand underlying the lanes and cul-de-sacs on the south half had not begun. No income from the sale of the sand was reported by petitioners on their 1972 joint Federal income tax return. 3. Peat and High-grade Soil Sales Issue
In late 1972, petitioner started an operation involving the sale of high-grade soil. This product was composed of peat mixed with sand or sawdust. The peat was obtained free of charge from George Hunt, Inc. The sand came from the Estates-Mahon tract. The peat was excavated in a wet state and had to be dried out. Land in Clearwater, Florida, approximately 10 miles from the tract, was maintained for this purpose. In late 1972 or early 1973, petitioner was advised by his accountant, Wilbur *374 Van Scoik (Van Scoik), to put this business in Jasmine Plaza, Inc.'s (Jasmine) name. Jasmine was incorporated in 1969 and was wholly owned by petitioners. A separate bank account for Jasmine was established in January 1973 for the business. Sales in 1972 and 1973, however, were made in the name of petitioner, GHFD, or George Hunt Top Soil. In 1972, petitioner sold approximately 600 cubic yards of this high-grade soil for a total sum of $1,913.50, [2]/ including sales tax. None of this income was reported for Federal income tax purposes by Jasmine or petitioners. For the fiscal year ended February 28, 1974, Jasmine reported on its Federal income tax return income from the 1973 sales of this soil. 4. Additions to Tax Issue
For many years, including 1972, petitioners had Van Scoik or members of his accounting firm prepare their income tax returns. With regard to the sand sales, it was Van Scoik's opinion that the receipts should be applied first to reduce petitioners' basis in the *375 land and, if such proceeds exceeded that basis, only then would petitioners have taxable income. Petitioners relied on his advice. When Van Scoik gave this opinion, he thought that the company, through Smith, was the only purchaser. In addition, he was not aware of the 1972 sales of high-grade topsoil. In his statutory notice of deficiency, respondent determined that petitioners failed to report on their 1972 joint Federal income tax return receipts of $80,162.37 from the sale of fill dirt and he allowed a 5-percent depletion deduction against this amount. In an amendment to his answer, respondent alleged that petitioners failed to report an additional $28,988.34 of receipts from the sale of fill dirt and topsoil and that petitioners are not entitled to the 5-percent depletion allowance. In addition, respondent alleged that petitioners are liable for an addition to tax equal to 5 percent of the underpayment under section 6653(a). OPINION 1. Landfill Sales Income Issue
Petitioner makes a series of alternative contentions as to the proper tax treatment of the proceeds received from the sale of landfill from the Estes-Mahon tract: First, petitioner contends that the *376 income derived from the landfill sales should be applied to reduce his basis in the tract. As a first alternative, petitioner argues that, under sections 611 and 612, he is entitled to a cost depletion allowance in respect of the income derived from the landfill sales. As a second alternative, petitioner maintains that under section 613(a) he should be allowed percentage depletion deductions from the landfill sales proceeds.
A.Reduction in basis
Petitioner contends that he purchased the Estes-Mahon tract for subdivision purposes. The hill located on the property, he maintains, had no value for such purposes and, indeed, had to be removed if the tract was to be subdivided. Petitioner argues, therefore, his basis in the tract consisted of the purchase price increased by the cost of removing the hill and decreased by the proceeds from the sale of the landfill. Petitioner analogizes the facts with respect to the subdivision of the property to those situations where a taxpayer acquires a construction site with the intention of demolishing or removing the buildings situated thereon. In such circumstances, the taxpayer's basis for the property is "increased by the net cost of *377 demolition or decreased from the net proceeds from demolition." Sec. 1.165-3(a)(1), Income Tax Regs.; Hillside National Bank v. Commissioner,35 T.C. 879, 881-882 (1961); Lynchburg National Bank & Trust Co. v. Commissioner,20 T.C. 670, 673-674 (1953), affd. 208 F.2d 757 (4th Cir. 1953). Even if we assume that the building demolition cases are apposite, they do not aid petitioner's cause. In the instant case, petitioner's primary purpose in acquiring the Estes-Mahon tract was not to subdivide it but was to excavate and sell the sand from the hill located thereon. Petitioner testified that he asked a "Mr. Howard, who lived in this area, * * * to show * * * [him] where * * * [he] could acquire another hill, because * * * [he] had done this two miles north of here." He explained that "the demand for fill was building up at a good price." As to his subdivision plans, petitioner testified that "the only way we could get permission to remove that hill would be to come up with a plan of development for a subdivision." This testimony and other evidence of record show quite clearly that petitioner acquired the Estes-Mahon tract primarily *378 to obtain a source of landfill. Having so acquired the tract, he continued the operation of his trade or business of selling landfill. The trial record simply will not support a finding that he removed the hill and sold the excavated sand primarily to improve the tract for use as a subdivision. Thus, the factual premise of petitioner's argument is missing. Petitioner's contention that his receipts from the sale of the landfill should first be applied to reduce his basis in the Estes-Mahon tract, therefore, must be rejected. B. Cost depletion issue
Petitioner's second contention is that he is entitled to cost depletion for the sand removed from the Estes-Mahon tract. In this respect, section 611 provides for a "reasonable allowance for depletion" in the case of extraction from mines and other natural deposits. The allowance is intended to return to the owner, taxfree, his capital investment over the productive life of the natural deposit. United States v. Cannelton Sewer Pipe Co.,364 U.S. 76, 81 (1960); Parsons v. Smith,359 U.S. 215, 220 (1959). Under the general rule for determining cost depletion, the number of units remaining in the *379 natural deposit as of the taxable year is first estimated.Then the portion of the adjusted basis of the property allocable to the depletable asset is divided by the number of units thus estimated, and the quotient represents the depletion unit.This amount, multiplied by the number of units sold during the taxable year, determines the depletion deduction for the year. Sec. 1.611-2(a), Income Tax Regs.
Under section 612, the general rule is that "the basis on which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 1011" for the purpose of determining gain or loss from disposition of the property. The beginning point for determining the adjusted basis of mineral property under section 1011 thus is its cost. The regulations provide that the basis for cost depletion of mineral property does not include the "residual value of land and improvements at the end of operations." They further state that "the basis for cost depletion does not include amounts representing the cost or value of land for purposes other than mineral production." Sec. 1.612-1(b), Income Tax Regs.
In substance, petitioner has the burden of showing what portion *380 of the $95,291.46 purchase price paid for the entire Estes-Mahon tract is properly allocable to the natural deposit, i.e., the removable sand. Potts Run Coal Co. v. Commissioner,19 B.T.A. 1, 5 (1930). Since the inquiry is directed toward ascertaining petitioner's basis for the sand deposit comprising the hill, the allocation must be made as of the date of the purchase. Sec. 1.611-2(d)(1), Income Tax Regs.; Beaver Dam Coal Co. v. United States,370 F.2d 414, 417 (6th Cir. 1966). The value of the tract for subdivision purposes at some subsequent date is relevant only insofar as such value tends to show values as of the acquisition date. As to the valuation of a mineral deposit, section 1.611-2(e)(4), Income Tax Regs., prescribes the ground rules for the present value method which petitioner evidently purports to use, as follows: The value of each mineral deposit is measured by the expected gross income (the number of units of mineral recoverable in marketable form multiplied by the estimated market price per unit) less the estimated operating cost, reduced to a present value as of the date for which the valuation is made at the rate of interest *381 commensurate with the risk for the operating life, and further reduced by the value at that date of the improvements and of the capital additions, if any, necessary to realize the profits. * * * Section 1.611-2(e)(3), Income Tax Regs., states that: The operating cost includes all current expense of producing, preparing, and marketing the mineral product sold (due consideration being given to taxes) exclusive of allowable capital additions * * * and deductions for depreciation and depletion, but including cost of repairs. Petitioner's contentions as to his basis in the sand deposit comprising the hill was summarized in his brief as follows: * * * Petitioners contend that at the time the Estes-Mahon property was acquired, the sand deposits were properly valued at $100,000.00 while the surface land was properly valued at $57,000.00 for a total value of $157,000.00. The purchase price was $95,291.00.Accordingly, Petitioners' sand deposits had a basis for cost depletion purposes of $60,691.00 computed as follows: 100,000/157,000 X $95,291.00 = $60,691.00. The remaining $34,600.00 represents Petitioners' capital investment in the surface land for which no depletion is claimed. *382 To support these values, petitioner relies upon the testimony that there were 100,000 cubic yards of removable sand on the tract, which could be sold for $1 per cubic yard. To support the claimed surface value, petitioner relies upon the testimony of Douglas Mason (Mason), a local real estate broker who testified the tract had a value of $57,000 at the time it was acquired. We are not satisfied that the testimony cited by petitioner shows how much of the $95,291.46 purchase price is allocable to the land. Ten of the 30 acres comprising the Estes-Mahon tract were either extremely low or flat and had no marketable sand deposits. Deposits of sand were located on the other 20 acres, but sand could not be excavated from the thickly-wooded southern half of the 20-acre portion (except in clearing streets) because local ordinances restricted tree removal. The 10 acres comprising the northern half of the 20-acre portion was the only area from which sand could be excavated, and the record contains no evidence of what portion of the $95,291.46 paid for the entire tract is equitably allocable to these 10 acres. For this reason alone petitioner's proof fails. Beaver Dam Coal Co. v. United States,supra at 417-418; *383 cf., Geoghegan & Mathis, Inc. v. Commissioner,453 F.2d 1324, 1328 (6th Cir. 1972), affg. 55 T.C. 672 (1971), cert. denied 409 U.S. 842 (1972).
Moreover, even if petitioner is entitled to have the allocation made with respect to the entire tract, he has not made the requisite showing. Petitioner arrives at a total value of $157,000 for the entire tract--$100,000 for the sand deposits and $57,000 for the tract's subdivision value. Yet petitioner bought the 30-acre tract of land for $95,291.46 on November 26, 1971, only a short time before the excavation began. There is no explanation of why, if petitioner's valuation figures are reasonably accurate, the tract sold for $60,000 less than its actual value. [3]/ The extreme position taken by petitioner immediately renders it suspect. *384 Mason's testimony, relied upon to establish the $57,000 valuation of the surface rights, was not directed to the residual value of the Estes-Mahon tract after the sand was removed. Rather, his testimony dealt with the value of the tract as "subdivision property" as it stood in December 1971, "without regard to the economic value of the fill dirt source located on the property." His value estimate, according to his oral testimony, was not influenced by the fact that "there were large hills on the property." In fact, his written appraisal report does not mention them. He based his testimony entirely "on comparable sales" of property located in the vicinity, [4]/ and he admitted that he had only "a general recollection of the property in the area." This testimony as to the value of the surface rights provides no reliable foundation for allocating *385 the $95,291.46 purchase price in part to the sand deposit and the balance to the rest of the tract or the residual value of the land from which the sand was removed. And the testimony as to the value of the sand deposit as such is even less satisfactory. Such testimony consists of an engineering estimate that approximately 100,000 to 115,000 cubic yards of sand could be excavated from the tract and testimony by others that the sand could be sold for $1 per cubic yard.Thus, petitioner's evidence merely reflects an estimate of the amount of gross income obtainable from the sale of the excavated sand. But depletion is related to the mineral deposit, i.e., to the minerals in place, sec. 1.611-1(d)(4), Income Tax Regs., and not merely to the gross income obtainable from the sale of the extracted minerals. As contemplated by section 1.611-2(e)(4), Income Tax Regs., quoted in part above, the value of the mineral deposit is to be determined by adjusting the amount of the expected gross income by the cost of producing that income and by interest thereon during the production period. The record contains no satisfactory evidence on the cost of excavating and loading the sand. George Hunt, *386 Inc.'s, equipment was, in fact, used in doing the loading and excavation work, and there is no testimony as to reasonably anticipated cost of such work. Moreover, the record raises serious doubts as to the accuracy of the $1 price for the sand. As reflected in our Findings, petitioner netted 95 cents per cubic yard for sand sold to meet the needs at the Ramada Inn campsite, but George Hunt, Inc., controlled by petitioner, was the contractor doing that work. We are not convinced that the 95-cents' price was representative. Indeed, certain invoices were stipulated showing that some of the sand was sold for as low as 60 cents and 75 cents per cubic yard or ton. Petitioner seeks to explain these lower prices on the theory that this sand was sold at such prices to meet contract commitments he had made at other sand pits he operated. We are not convinced that those contract commitments do not reflect the reasonably anticipated price for excavated sand more accurately than the Ramada Inn campsite prices. The record simply will not support the findings of fact needed to compute a cost depletion allowance with respect to the sand. We hold that petitioner has not shown that he is entitled *387 to such an allowance. 2. Percentage Depletion Allowance Issue
Section 613(a) [5]/ provides that the allowance for depletion under section 611 in "the case of the mines, wells, and other natural deposits listed in subsection (b)" shall be a percentage, as specified in subsection (b), based on the type of mineral extracted, of the gross income from the property limited, however, to 50 percent of taxable income, subject to certain adjustments irrelevant herein. Section 613(b)(6)(A) provides that the percentage depletion for "sand" will be 5 percent. A catchall provision, section 613(b)(7), provides a 14-percent percentage depletion allowance for "all other minerals" not separately classified in sections 613(b)(1) through (6). Section 613(b)(7)(A), however, excludes from this group of minerals "soil, sod, dirt, turf, water, or mosses." *388 Respondent argues that the landfill excavated by petitioner from the tract falls within the section 613(b)(7)(A) excluded group. The notice of deficiency allowed percentage deplation in respect of the gross income derived from sand sales computed at the rate of 5 percent prescribed for sand. In an amended answer respondent alleged that petitioner received the disputed income from "the sale of soil and fill dirt" and that the sale of such materials was not subject to the percentage depletion allowance. Thus, the burden of showing that the material excavated and sold from the Estes-Mahon tract was not sand rests with respondent. Rule 142(a), Rules of Practice and Procedure of this Court. Although petitioner, and apparently everyone involved with the sand sale operation in everyday business transactions, referred to the extracted landfill from time to time as dirt, we think the technical classification was in reality "yellow sand" [6]/ which qualifies for a 5-percent depletion allowance under section 613 (b)(6)(A). The notice of deficiency so determined, and respondent has not carried his burden of showing otherwise. *389 3. High-grade Topsoil Sales Issue
Petitioner contends that the receipts totaling $1,913.50 from the sale in 1972 of high-grade topsoil are properly attributable to Jasmine, petitioner's wholly owned corporation, rather than to himself. We disagree. Although petitioner's accountant advised him that it would be best to put these operations in Jasmine's name, petitioner failed to do so in 1972. Sales of the high-grade topsoil were made in the name of petitioner, GHFD, or George Hunt Top Soil rather than in Jasmine's name and the record does not show that this treatment of such sales was erroneous. A separate bank account for the operation by the corporation was not opened until January 1973. Sales receipts and expenses incurred up to this date were run through petitioner's personal bank account. We conclude petitioner operated this business as his own during 1972. 4. Negligence Penalty Under Section 6653(a)
Section 6653(a) provides that if any part of an underpayment of Federal income taxes "is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the *390 underpayment." Since respondent first claimed in an amendment to his answer that petitioner was liable for this negligence penalty, respondent has the burden of proof. Rule 142(a), United States Tax Court Rules of Practice and Procedure.
Reasonable reliance on the advice of an expert is enough to avoid the negligence penalty. Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272, 283 (1976). In the instant case, respondent has failed to prove that petitioners, as be contends, did not reasonably rely on the advice of Van Scoik, his long-time accountant, in not reporting the proceeds from the sale of the sand and the high-grade soil on their 1972 joint Federal income tax return. Van Scoik testified that, in his view, petitioner had no taxable income on the theory that the proceeds of the sand sales were to be first applied against the tract's basis and that the proceeds did not exceed this basis. When he gave his advice he was not aware that petitioner made sales of sand to more than one customer and that sales of highgrade soil were made in 1972. However, there is no evidence that petitioner withheld such information from Van Scoik. While we disagree *391 with Van Scoik's views on the tax treatment of the sand and soil sales income, we do not think petitioner was negligent or intentionally disregarded the regulations. To reflect the foregoing, Decision will be entered under Rule 155.[7]/ Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.
2. /↩ The parties stipulated that gross proceeds received in 1972 from these sales were $1,118.50. However, the underlying invoices reflect that $1,913.50 is the correct amount.
3. / With respect to the fact that petitioner paid $95,291.46 for the tract, Mason testified: Q. Are you aware that Mr. Hunt paid $95,000.00 for that property or approximately $95,000.00 for that property in November of 1971? A. Yes, I'm aware of that. Q. And yet you valued the property at $57,000.00. A. That is correct. Q. Do you think Mr. Hunt got took or-- A. In 1971 or December of 1971 if I had had that property listed at $95,000.00, I wouldn't have even presented it to Mr. Hunt because I probably would not have listed it because I would have thought I would be wasting my advertising dollars advertising that at $95,000.00.↩
4. / With respect to the 20 acres on which the sand deposit was located, Mason testified: Q. Then you valued this subject property without ever inspecting the terrain of the north half of the 20 acre tract. A. Yes. I was asked to give an appraisal of that property. And I did it solely on comparable sales in the area.↩
5. SEC. 613. PERCENTAGE DEPLETION. (a) General Rule. -- In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). For purposes of the preceding sentence, the allowable deductions taken into account with respect to expenses of mining in computing the taxable income from the property shall be decreased by an amount equal to so much of any gain which (1) is treated under section 1245 (relating to gain from disposition of certain depreciable property) as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231, and (2) is properly allocable to the property. In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.↩
6. /↩ At trial, Santiago Lloveras, a professional civil engineer and land surveyor, described the excavated materials as "yellow sand." Mason, a real estate broker in Clearwater, Florida, referred to the material as "fill dirt or soil, top soil, or white sugar sand, or whatever you want to call it." This illustrates the loose terminology used in the landfill business.
7. / In accordance with Key Buick Co. v. Commissioner,68 T.C. 178↩ (1977), petitioner's request for an award of reasonable attorneys' fees is denied.