IBABAO MEDICAL CORPORATION, Petitioner v. COMMISSIONER OF INTTERNAL REVENUE, Respondent; FLORENTINO T. and LILIA F. IBABAO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ibabao Medical Corp. v. Commissioner
Docket Nos. 26822-84; 26823-84.
United States Tax Court
T.C. Memo 1988-285; 1988 Tax Ct. Memo LEXIS 316; 55 T.C.M. (CCH) 1183; T.C.M. (RIA) 88285; June 29, 1988. Patrick J. Quinn, for the petitioners. Beatrice M. Pearson, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION Wright, Judge: By separate notices of deficiency dated April 25, 1984, respondent determined the following deficiencies in petitioners' Federal income tax: Additions to Tax
Petitioner
Taxable Year
Deficiency
Sec. 6653 (a) [1]
Ibabao Corp.
1980
$ 10,552
$   528
1981
20,180
1,009
Florentino and
1979
$ 14,357
718
Lilia Ibabao
1980
40,719
2,036
1981
34,862
1,743
*317 Respondent also determined that petitioners Florentino T. and Lilia F. Ibabao and petitioner Ibabao Medical Corporation were liable for additions to tax pursuant to section 6653 (a) (2) for taxable year 1981. After concessions, [2] the issues for our consideration in these consolidated cases are: (1) whether petitioner Ibabao Medical Corporation properly claimed a deduction under section 162 for payments made to a business trust; and (2) whether petitioner Ibabao Medical Corporation and Florentino and Lilia Ibabao are liable for an addition to tax pursuant to sections 6653 (a) (1) and (a) (2) for negligent underpayment of tax. *318 FINDINGS OF FACT Petitioner Ibabao Medical Corporation (hereinafter referred to as the corporation), an accrual basis taxpayer, had its principal place of business in Pinole, California, at the time of filing the petition. The corporation filed timely Federal income tax returns for taxable years ending on October 31, 1980 and October 31, 1981, with the Internal Revenue Service Center in Fresno, California. Florentino T. and Lilia F. Ibabao (hereinafter referred to collectively as petitioners), cash basis taxpayers, are husband and wife and resided in Orinda, California, at the time of filing the petition herein. Petitioners timely filed joint Federal income tax returns for taxable years ending December 31, 1979, December 31, 1980 and December 31, 1981, with the Internal Revenue Service Center in Fresno, California. Petitioners were the sole shareholders, officers and directors of the corporation during the years in issue. Both petitioners were licensed physicians during the years in issue. After attending medical school at the University of Santo Tomas in the Philippines, petitioners moved to Cleveland, Ohio, in 1960 where Florentino Ibabao maintained a private practice *319 in general surgery and Lilia Ibabao taught medicine at a university. In 1963, petitioners moved to California where Florentino Ibabao conducted a private surgical medical practice at which his wife was employed as an anesthesiologist throughout the years in issue. Petitioners learned of the American Law Association (ALA0 foreign trust [3] plan (ALA trust plan) in 1979 from Florentino Ibabao's associate, Dr. Whitson, who informed petitioners that the ALA trust plan was a legal method of minimizing income taxes and "good for doctors." Dr. Whitson introduced Florentino Ibabao to Bob Lewis (Lewis), a promoter off the ALA trust plan. Encouraged by Lewis, petitioners attended an ALA seminar held two weeks after the initial meeting. The two-day ALA seminar was comprised of four hours of presentation each day. Recognizing several other doctors at the seminar, petitioners gained confidence in ALA. Petitioners had been involved in tax shelters prior to their participation in the ALA trust plan but had been disappointed by their experience. [4]
*320 During the presentations, ALA associates explained the structure and operation of the trust plan. The seminar participants were given a handbook (the handbook) which contained mimeographed copies of excerpts from cases from various Federal and state courts and circuit courts of appeal on many different subjects. The gist of the selected cases was that individual taxpayers have certain rights vis-a-vis the Internal Revenue Service (the Service) which could only be protected by defiant non-cooperation during audit. The handbook also included a number of case excerpts describing and discussing the so called "Massachusetts business trust" or the "common law business trust" or occasionally simply the "business trust" (referred to herein as the business trust), which is the essence of the ALA trust plan. Although petitioners listened attentively and read the handbook they did not completely understand the scheme of trusts and corporations which comprised the ALA trust loan. [5]
After the seminar, petitioners took steps to implement the ALA trust poan. Acting on Lewis' recommendation, they hired *321 Phyllis Farr (Farr) as a bookkeeper. Farr had attended many of the ALA seminars [6] and she advised petitioners as they created their trusts in accordance with the ALA trust plan. Farr, in turn, recommend Gilbert Armstrong (Armstrong), a certified public accountant, who was experienced in organizing and operating ALA trusts. In addition to advising petitioners with respect to the ALA trusts, Armstrong prepared Federal income tax returns for both the corporation and petitioners during all the taxable years in issue. With respect to matters pertaining to the organization and operation of the ALA trusts, petitioners relied completely on advice given by Armstrong and Farr. The structure of the ALA trust plan implemented by petitioners was complex. On October 17, 1979, four trusts were organized as Belize common law business trusts. [7]The trusts were named Manak, Clevtor, Aklor and Orman. [8] Pursuant to documents entitled "Contract and Declaration of Common Law Business Trust Organization" (the contract), Aklor, Clevtor and Orman were organized for a stated *322 term of 25 years to be extended or shortened upon the sole discretion of the trustee. [9] The contracts empowered the trustee to appoint a second trustee and then, in conjunction with the second trustee, to appoint a third trustee, assigning the trust property to the trustees to hold as joint tenants in fee simple. The contract authorized the trustees to employ agents and employees and further provided that any resolution by the board of trustees was evidence that the authorized act was within the trustees' power. On October 17, 1979, C. Grant, [10] the grantor, purported to trade one dollar and 100 trust certificates to petitioners, creating Manak, Clevtor and Aklor. The 100 trust certificates in Orman were given in exchange, along with one dollar, by C. Grant to Aklor. C. Grant received certain items of office property [11] in exchange for the trust certificates in Manak, cash in the amounts of $ 50 and $ 100 for the trust certificates for Orman and Aklor respectively and $ 500 in cash and certain documents and records in exchange for trust certificates for Clevtor. [12]
*323 On October 17, 1979, C. Grant, the creator of all four trusts, appointed trustees. Aklor was appointed as first trustee of Manak, Clevtor and Orman. The first trustee of Aklor was John B. Cartwright [13] (Cartwright) who appointed Florentino Ibabao as the second trustee before resigning as first trustee on October 20, 1979. Florentino Ibabao then appointed Lilia Ibabao as second trustee. Two days later the board of trustees off Aklor appointed Florentino Ibabao as executive trustee. Aklor appointed petitioners as agents of both Clevtor and Orman, designating them president and secretary and authorizing them to conduct business. Aklor, as trustee, transferred 100 units [14] in Orman to itself and 100 units in Clevtor to petitioners, granting to the unit holders a contingent right to income as distributed at the sole discretion of the trustee. Petitioners, as trustees, issued 100 units in Manak to Orman, conveying to Manak contingent rights to income as distributed at the sole discretion of the trustee. On November 7, 1979, petitioners sold their units in Clevtor and Aklor to Orman. On November 1, 1979, the corporation loaned Manak $ 13,000 and in a letter dated November 27, 1979, demanded *324 repayment of the loan. Manak repaid the loan in the full amount of $ 13,000 on November 27, 1979. When the dust settled Aklor was the trustee of Orman, Clevtor and Manak, while petitioners were the trustees of Aklor. Orman held the trust units n Manak, Aklor and Clevtor and Clevtor held the trust units in Orman. Petitioners were the authorized agents of Orman and Clevtor, and the sole shareholders, officers and directors of the corporation. [15]
Once the various trusts were organized money *325 began to flow through them. The corporation employed petitioners to provide medical services and hired Manak as a management service company to operate petitioners' private surgical practice. The fee for Manak's management services was $ 6,400 per month. [16] The management services contract was signed by Florentino Ibabao on behalf of both the corporation and Manak. During taxable year 1980, the corporation issued checks to Manak for every month except February, usually in the amount of $ 6,000, although two checks were written in the amounts of $ 9,600 and $ 1,500. For taxable year ending October 31,1981, the corporation issued 13 checks to Manak in the amount of $ 6,000 and one in the amount of $ 5,500. In taxable year ending October 31, 1982, the corporation issued 10 checks in the amount of $ 6,000 to Manak. All payments made by the corporation to Manak were entered as compensation on the corporation's books and records. Manak then transferred the money to Orman in a series of payments representing contingent royalty payments [17] made between March 1980 and October *326 1982. The payments were typically issued in the amount of $ 6,000 per month. [18] Orman resolved to loan Clevtor $ 6,000 a month [19] for the period between March 1980 and October 1982, although in some months the amount varied. [20] Clevtor then issued monthly promissory notes (the Clevtor notes) to Orman which would mature one year from the date of issue and which bore an annual interest rate of 8 percent, waiverable if the loan was paid on demand. On October 15, 1979, the board of trustees of Orman authorized gifts of the Clevtor notes to petitioners. Florentino Ibabao then demanded payment for the Clevtor notes from Clevtor each month, typically receiving $ 6,000 per month although occasionally the payment ranged between $ 5,500 and $ 3,000. Petitioners received total payments from Orman in 1980, 1981 and 1982 in the aggregate amounts of $ 57,000, $ 60,500 and $ 63,500, respectively. All of these transactions were authorized by petitioners acting either as trustees in their own right or as trustees of Aklor, and documented in the books and records of the trusts. *327 In addition to the gifts of the Clevtor notes petitioners received compensation from the corporation for medical services performed during the taxable years in issue. Petitioners received compensation in the following amounts: Petitioner
1979
1980
1981
Florentino Ibabao
$ 78,500
$ 30,000
$ 36,000
Lilia Ibabao
50,000
30,270
21,200
All these amounts were reported as compensation on Forms W-2. The management contract executed on November 2, 1979, between the corporation and Manak allocated to Manak the duties of "preparation of reports for the accountant, overseeing office staffs, conferences with the medical personnel, evaluation of office staffs, and other services from time to time appropriate." During the years in issue the corporation employed one full time and two part time employees in addition to petitioners. Manak hired no employees in its own name and did not maintain a payroll. The employees kept the office books and patient records, scheduled appointments, cleaned the examination rooms, sterilized the equipment and dealt with the patients. One employee handled all of the billing during the years in issue. During 1980 and 1981, *328 Florentino Ibabao ordered the supplies, issued checks for bills and payroll, supervised office personnel, while Lilia Ibabao oversaw the operation of the office staff and billing procedures. Florentino Ibabao estimated that he spent two thirds of his working time seeing patients or in surgery, devoting the other third to office management, and that he spent more time providing management services after the formation of Manak than prior to the organization of the trust. Although petitioners performed management services for the surgical practice they never received compensation from Manak. In October of 1982, Farr informed petitioners that Armstrong, their accountant, had come under investigation by the Service for his connection with the ALA trust plan. For the first time, petitioners consulted an attorney who was not affiliated with ALA and who advised them to discontinue the ALA business trusts. By formal notice, the corporation terminated Manak as a management services company. The corporation claimed deductions for the fees paid to Manak for management services for the taxable years 1980 and 1981 in the amounts of $ 56,100 and $ 76,676, respectively. There amounts, in *329 addition to various other amounts which are not in issue here, were disallowed by respondent in their entirety. OPINION The first issue for our consideration is whether the corporation properly deducted payments made during taxable years 1980 and 1981 to Manak as payments for reasonable compensation. Section 162 (a) provides a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable amount for compensation. Section 1.162-7 (a), Income Tax Regs., provides that the "test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." A key factor in determining the existence of compensation payments is the intent of the parties. Paula Construction Co. v. Commissioner, 58, T.C. 1055 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner,56 T.C. 1324 (1971), affd. per curiam 496 F.2d 1345 (5th Cir. 1974). *330 Petitioner maintains that the payments made by the corporation to Manak were reasonable in amount and were made in exchange for the management services Manak provided to the corporation. Because the corporation and Manak executed a binding contract and the promised services were, in fact, ultimately performed, petitioners argue that the payments are properly deductible as compensation payments within the meaning of section 162 (a). Petitioners bear the burden of proof on this issue. Welch v. Helvering,290 U.S. 111, (1933); Botany Worsted Mills v. United States,278 U.S. 282 (1929); Rule 142 (a). Respondent counters that, although the payments would have been reasonable in amount had they been paid directly to petitioners,they do not constitute compensation when paid to Manak because the arrangement between the corporation and Manak had no economic substance. Because petitioners controlled all the ALA trusts as well as the corporation, respondent contends that the chain of financial transfers commencing with the corporation and continuing through to Manak and the other ALA trusts had no economic substance and constituted a series of sham *331 transactions. Thus, the payments from the corporation to Manak would have no significance for purposes of Federal income tax. It is well established that taxpayers have the right to arrange their finances in order to lawfully minimize taxes. Gregory v. Helvering,293 U.S. 465, 469 (1935). However, where the transaction has no real economic significance we need not recognize it for purpose of Federal income tax. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Knetsch v. United States,364 U.S. 361 (1960). When the form of the transaction has not, in fact, altered any cognizable economic relationships, the form will be ignored and the law will be applied according to the substance of the transaction. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981); Markosian v. Commissioner,73 T.C. 1235 (1980). Particularly where the taxpayer controls the entities involved, we must carefully scrutinize the transaction for economic viability Derr v. Commissioner,77 T.C. 708 (1981). *332 Respondent argues that because petitioners concede that the entire ALA trust plan was a sham, the transactions between the corporation and Manak were also paper transactions. Respondent further argues that neither the corporation nor Manak ever intended that Manak actually perform the promised management services. After considering all the evidence and arguments, we conclude that the transactions between the corporation and Manak had no economic substance and therefore the payments may not be deducted by the corporation. The evidence is conclusive that the ALA trusts were all part of a single plan. Because petitioners admit that Orman, Clevtor and Aklor had no economic validity, it follows that Manak was equally illusory. In Professional Services v. Commissioner,79 T.C. 888 (1982), [21] we considered a similar arrangement of ALA trusts and determined that, with respect to a series of transactions which were strikingly similar to those in the instant case, the entities involved were shams because the taxpayer had complete control over them all and the alleged transactions left the taxpayer's economic position unchanged. We also determined that because the *333 ALA trusts were shams, the transactions which they conducted had no economic substance. The structure and operation of the trusts in Professional Services v. Commissioner, supra, are virtually indistinguishable from the trusts created by petitioners and we decline to accord these ALA trusts any greater weight then we have done in the past. Furthermore, the specific transactions between the corporation and Manak were illusory because all of the services allegedly performed by Manak were, in fact, performed by employees of the corporation. Manak had no employees and no payroll. All of the employees who provided management services were paid by the corporation. Petitioners, who were paid a portion of their annual salaries directly from the corporation and the other portion via the circuitous conduit through the ALA trusts, received no compensation directly from Manak. Petitioners make much of the fact that Florentino *334 Ibabao's management duties increased after the creation of the ALA trusts, but the fact only proves that operating Manak and the other ALA trusts was time consuming, not that he was working for Manak instead of for the corporation. In short, there is no evidence in the record that the performance of management services for the corporation was in any way attributable to Manak. Petitioners place great emphasis on the formalities between the corporation and Manak. They point to the contract which described Manak's management services and the letter from the corporation which purported to terminate that contract as evidence that the corporation intended the payments to Manak to be compensation. However, because petitioners controlled both the corporation and Manak, such documents really demonstrate only that petitioners wanted to create the impression that the corporation intended the payments as compensation. In light of all the evidence indicating that the entire ALA plan was a sham, the formalities which transpired between the corporation and Manak are insufficient to lend economic substance to the transaction. The second issue for our consideration is whether petitioners *335 and the corporation are liable for an addition to tax for negligent underpayment of tax pursuant to sections 6653 (a) (1) and 6653 (a) (2). Sections 6653 (a) (1) and (a) (2) provide an addition to tax equal to 5 percent of any underpayment due to negligence or intentional disregard of the rules or regulations and an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to that underpayment. Petitioners bear the burden of proving that additions to tax determined by respondent should not be sustained. Hall v. Commissioner,729 F.2d 632 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court; Luman v. Commissioner,79 T.C. 846, 860-861 (1982). Negligence under sections 6653 (a) (1) and (a) (2) is defined as lack of care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 932, 947 (1985). With respect to *336 negligence, the intent of the sole shareholders and officers are imputed to the corporation. Auerbach Shoe Co. v. Commissioner,21 T.C. 191, 194 (1953), affd. 216 F.2d 693 (1st Cir. 1954). Although petitioners concede that the other ALA trusts, Clevtor, Aklor and Orman were shams, they maintain that they relied on the advice of persons they believed to be knowledgeable and trustworthy. Because the ALA trust plan and "a tax shelter" were distinguishable, in their minds, petitioners believed that the ALA trusts lawfully minimized their Federal income taxes and that the scheme was legitimate. It is well established that taxpayers must exercise reasonable care in scrutinizing a proposal which seems too good to be true. Parker v. Commissioner,86 T.C. 547, 566 (1986). Petitioners concede that ordinarily income taxes must be paid on a taxpayer's wages and salaries. Thus, when the ALA trust plan purported to protect a sizable portion of their income from income tax they should have been alerted to the possibility that it might not be as legitimate *337 as it appeared. A taxpayer may not be liable for negligence if he can show that he reasonably relied on advice from competent experts. Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272, 283 (1976). Furthermore, a taxpayer may safely rely on the legal opinion of competent tax counsel and thus avoid an addition to tax for negligence. Jackson v. Commissioner,86 T.C. 492, 539 (1986). However, petitioners relied only on the advice of the ALA promoters or persons recommended by the ALA promoters. Both Farr and Armstrong were hired precisely for their ties with ALA. Promoters and their associates are not generally considered competent tax pexperts. A reasonable investor would consult a disinterested and competent expert before following a promoter whose intent might be trickery. We conclude that petitioners did not conduct themselves as ordinarily prudent and reasonable people. Thus, we conclude that respondent's determinations of additions to tax pursuant to sections 6653 (a) (1) and (a) (2) will be sustained with respect to the corporation *338 and petitioners. In sum, after carefully considering all the evidence and the arguments presented by both sides we conclude that the corporation improperly claimed deductions in taxable years 1980 and 1981 for payments to Manak trust and that the corporation and petitioners Florentino and Lilia Ibabao were liable for additions to tax for negligent underpayment with respect to the taxable years 1979, 1980 and 1981. To reflect the foregoing, Decisions will be entered for the respondent.
Footnotes
1. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax court Rules of Practice and Procedure.↩
2. Petitioners consented to an increase in tax for taxable years 1979 and 1970 in the amounts of $ 1,244 and $ 1,971, respectively. Petitioners and respondent agree that the compensation paid to petitioners Florentino and Lilia Ibabao by petitioner Ibabao Medical Corporation in taxable year 1979 was reasonable in amount and that if the amounts which were paid by petitioner Ibabao Medical Corporation to Manak trust had been paid as compensation to petitioners Florentino and Lilia Ibabao directly, it would have represented reasonable compensation in amount, although petitioners do not agree that it was compensation for purposes off Federal income tax. Petitioners Florentino and Lilia Ibabao conceded that they failed to report long-term capital gain in the amount of $ 14,833 from the sale of their partnership intterest in the Yountville Cross Vineyards in taxable year 1979, that they failed to report interest income in taxable year 1980 and 1981 in the total amounts of $ 338 and $ 1,343, respectively, and that they improperly claimed an itemized deduction in the amount of $ 10,500 for costs associated with attending a seminar promoting the foreign trust plan of the American Law Association in taxable year 1979.↩
3. The terms "trust," "foreign," "purchase," "sale," "note," "gift," "borrow," "loan," "royalty payment," "management service," "contract" and all related derivations are used herein merely for convenience in describing the form of purported transactions, and without intending any inference as to the tax characterization or consequences of any aspect of the transaction. ↩
4. Florentino Ibabao indicated that they had participated in tax shelters concerning feed lots, an air park and electronics products, but he had not made any money on any of these. ↩
5. Lilia Ibabao read the handbook twice and still could not grasp its meaning. ↩
6. Farr explained that while dating one of the promoters of the ALA trust arrangement she attended 20 or 25 seminars. ↩
7. About two weeks after the seminar, Lewis gave petitioners several documents which created four ALA trusts. The documents bore stamps purportedly issued by government officials in Belize. Petitioners were told that the documents had been notarized in Belize by a Mr. Cartwright, although they were given no proof of this. ↩
8. Petitioner Lilia Ibabao explained that the names were derived from names of places she and her husband had been. For example, Clevtor took part of its name from Cleveland while Aklor came from Akland, her husband's childhood home. ↩
9. There is no reason to believe that Lewis failed to draw up a similar "Contract and Declaration of Common Law Business Trust Organization" for Manak but it was not a part of the record before us. ↩
10. There was no evidence that C. Grant was a real person. ↩
11. In addition to cash in the amount of $ 50, petitioners gave C. Grant a Smith Corona electric typewriter, a metal desk, a steno chair and a 5 x 8 file. ↩
12. Specifically, the individual petitioners gave C. Grant "certain documents and records pertaining to Tax Treaties with the Country of Belize and the United States of America; various papers dealing with Trust Organizations, their history, and origination in old English Common Law; certain texts dealing with the management and administration of Trust Organizations, and the accounting documentation required." ↩
13. There was evidence that John B. Cartwright did exist although it appears that he was merely a straw man, facilitating the creation of the ALA trusts. ↩
14. The trust units which were transferred pursuant to trust certificates did not entitle the holder to any legal or equitable interest in the trust property nor to participate in trust management. ↩
15. There was no evidence that the corporation had been organized solely to play this role in the ALA trust arrangement. Rather, it appears that the corporation was already in existence before the creation of the ALA trusts although the parties presented little information at trial about the history and purpose of the corporation. ↩
16. This figure was chosen by Armstrong, petitioners' accountant, without demonstrable foundation. ↩
17. In the many trust documents presented at trial, there was no indication that any interest or right had been transferred to Manak for which it would owe royalty payments to Orman. ↩
18. In the period between March 12, 1980 and October 17, 1982, Manak issued one check in the amount of $ 9,600, and one check in the amount of $ 3,000, one check in the amount of $ 5,500 and one check in the amount of $ 2,000. ↩
19. For reasons which were not explained at trial, the amount of borrowed funds which Clevtor was authorized to borrow did not always equal the amount which Orman was authorized to lend. ↩
20. Specifically, the loan for March 1980 was for $ 9,600, the loan for December 1981 was $ 5,500, and there were two loans in January and June of 1982 which in the aggregate equalled $ 6,000. ↩
21. See also Zmuda v. Commissioner,79 T.C. 714, 724-725 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Akland v. Commissioner,T.C. Memo. 1983-249, affd. 767 F.2d 618↩ (9th Cir. 1985).