INDUSTRIAL VALLEY BANK AND TRUST COMPANY, SUCCESSOR BY MERGER TO DOYLESTOWN TRUST COMPANY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6677-73, 6678-73.    Filed May 18, 1976.

---

[1] The following case is consolidated herewith: Industrial Valley Bank and Trust Company, Successor By Merger To Lehigh Valley Trust Co., docket No. 6678-73.

*Edwin A. Easton,* for the petitioners.
*Howard W. Gordon,* for the respondent.

OPINION

HALL, *Judge:* Respondent determined the following deficiencies for the following years: [2]

| Bank | Year | Deficiency | Sec. 6653(a) addition to tax |
|---|---|---|---|
| Lehigh Valley Trust Co. _____ | 1962 | $1,142.89 | |
| | 1963 | 13.03 | |
| | 1964 | 167.52 | |
| | 1965 | 45,795.41 | $2,289.77 |
| | 1966 | 66,728.31 | 3,336.42 |
| | 1967 | 3,334.47 | 166.72 |
| Doylestown Trust Co._____ | 1968 | 29,516.00 | 1,476.00 |

This case was submitted fully stipulated under Rule 122. Concessions having been made by both parties, the questions remaining for determination are:

(1) Whether respondent abused his discretion in denying Lehigh Valley Trust Co. and Doylestown Trust Co. certain additions to their bad debt reserves for 1968 and 1969, respectively.

(2) Whether part of the underpayment of taxes is due to negligence or intentional disregard of the rules and regulations.

### Lehigh Valley Trust Co.

Lehigh Valley Trust Co. (Lehigh) was a Pennsylvania corporation, having its principal place of business in Allentown, Pa. During 1968, Lehigh merged into Industrial Valley Bank (IVB) pursuant to a tax-free reorganization under section

---

[2] The deficiencies primarily result from reductions in net operating loss carrybacks.

368(a)(1)(A).[3]

On June 6, 1968, the directors of IVB and Lehigh adopted a joint plan and agreement of merger. On September 10, 1968, the shareholders of Lehigh and IVB adopted articles of merger. The approval of all State and Federal regulatory agencies for the merger of Lehigh and IVB was received before December 13, 1968.

At a special meeting of Lehigh's board of directors on December 13, 1968, the following resolutions were adopted:

RESOLVED, That the officers be, and hereby are, authorized to purchase from the Industrial Valley Bank and Trust Company participations in loans [4] in an amount not to exceed $17,500,000 and it was

FURTHER RESOLVED, That the officers be, and hereby are, authorized to add an amount not to exceed $250,000 to the Loan Loss Reserve, and it was

FURTHER RESOLVED, That the officers be, and hereby are, authorized to borrow Federal Funds [5] on the open market in an amount not to exceed $15,000,000 at such rates of interest as shall prevail, and it was

FURTHER RESOLVED, That the officers be, and hereby are, authorized to sell at market up to $10,000,000 of U. S. Government obligations, which may include obligations of the Federal National Mortgage Association, and to purchase with the proceeds Treasury Bills which may be repledged and substituted for the above mentioned Government obligations as collateral to secure deposits.

Pursuant to the resolutions adopted by Lehigh on December 13, 1968:

(a) Lehigh purchased loan participations from IVB totaling $17,500,000 on December 18, 1969.

(b) Lehigh added $250,000 to its bad debt reserve for the period ending December 20, 1968.

(c) Lehigh purchased Federal funds as follows:

---

[3] All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

[4] A loan participation, as such term is used herein, refers to an undivided interest in a loan made by a bank to a third party. Although the original lending bank remains as the named lender, as among the participants in the loan, each participant shares equally in the benefits and burdens of the loan.

[5] A Federal funds transaction is one between banks involving the purchase (borrowing) or sale (lending) of bank deposits for very short periods (typically overnight). The purchase is made necessary by lack of legal reserves of the purchasing bank in relation to its deposits.

| Date | Amount |
|------|--------|
| Dec. 18, 1968_____ | $10,500,000 |
| Dec. 19, 1968_____ | 10,200,000 |
| Dec. 20, 1968_____ | 10,500,000 |

Prior to December 13, 1968, Lehigh had had an excess of funds which were not committed to commercial loans and, therefore, was a seller of Federal funds or made overnight loans to other banks.

(d) Lehigh sold Government obligations on December 18, 1968, for $4,560,140, incurring a $167,890 loss on the sale.

On December 23, 1968, a certificate of merger was issued to IVB and Lehigh.

During 1968, Leon King was vice president and comptroller of IVB. Commencing in 1969, he served as senior vice president in charge of the Financial Services Division. Mr. King is a certified public accountant. At the special meeting of the board of directors of Lehigh on December 13, Leon King recommended that Lehigh's board of directors adopt the resolutions which were adopted.

John Shevets was vice president and treasurer of Lehigh (but not a member of its board of directors). At the meeting of the board on December 13, John Shevets indicated that he was troubled by Lehigh's purchase of loan participations and the part they played in determining the deduction for bad debts under Rev. Rul. 68-630 (cited and discussed *infra*).

A very large portion of IVB's total resources was committed to loans and mortgages. Moreover, IVB wished to retain $15 million in Treasury bills maturing on or about January 23, 1969, sale of which would have caused losses. For these reasons IVB had to borrow Federal funds at a rate of approximately $15 million to $20 million per day between December 9, 1968, and December 17, 1968. In addition, IVB had been a borrower of Federal funds from November 4, 1968, until December 9, 1968, when its daily borrowings increased. IVB wanted to be out of debt, even if it were only for a short period of time, so that other banks from which it borrowed Federal funds would see that IVB was not in a position of being a constant borrower. A correspondent New York bank had voiced such a concern. Moreover, an old banking code regulation prohibited a bank from being a borrower for an uninterrupted period of 3 months. Even though this regulation was no longer in effect, IVB followed it as a matter of policy for

purposes of satisfying bank examiners and others who might be similarly concerned. Lehigh's acquisition of $17,500,000 of loan participations from IVB allowed IVB to be out of debt from December 18 through December 23, 1968.

Two of the reasons advanced by Leon King for Lehigh's board of directors' adoption of the resolutions which were adopted on December 13 were to reflect a more aggressive lending policy and to enable IVB to be out of debt with respect to Federal funds for a 5-day period.

In order for Lehigh to acquire the $17,500,000 of loan participations from IVB, it had to sell Government obligations, use available funds which were previously the basis of Federal funds sold, and purchase Federal funds. Lehigh had previously acquired loan participations, as follows:

| Date on | Date off | Amount | Bank |
|---------|----------|--------|------|
| 12/31/64 | 1/4/65 | $7,000,000 | Irving Trust Co. |
| 9/30/65 | 10/3/66 | 5,300,000 | Irving Trust Co. |
| 12/31/65 | 1/10/66 | 1,500,000 | First Pennsylvania Bank |
| 12/31/65 | 1/3/66 | 5,400,000 | Irving Trust Co. |
| 12/31/65 | 1/3/66 | 3,400,000 | Chase Manhattan Bank |
| 2/18/66 | 5/26/66 | 500,000 | Chemical Bank |
| 2/18/66 | 5/25/66 | 500,000 | Chemical Bank |
| 3/1/66 | 3/22/66 | 500,000 | Chemical Bank |
| 12/30/66 | 1/5/67 | 6,600,000 | Irving Trust Co. |
| 2/8/67 | 3/14/67 | 1,600,000 | Morgan Guaranty |
| 3/31/67 | 4/3/67 | 5,600,000 | Irving Trust Co. |
| 4/18/67 | 6/5/67 | 500,000 | Chemical Bank |
| 6/30/67 | 7/3/67 | 6,300,000 | Irving Trust Co. |
| 8/28/67 | 7/31/67 [sic] | 2,400,000 | Irving Trust Co. |
| 12/29/67 | 1/2/68 | 7,900,000 | Irving Trust Co. |

Lehigh participated in loans at the end of the year and at mid-year because of deposits made by Pennsylvania Power & Light Co. amounting to $6 million or $7 million to cover payment of dividends.

With the merger on December 23, 1968, IVB acquired by operation of law all the assets of Lehigh including the $17,500,000 in loan participations. IVB was therefore restored with respect to the loan participations to substantially the same position it had been in 5 days earlier when it sold them to Lehigh.

Lehigh's final tax return was prepared by C.P.A. John Lally, Jr. He was aware that the loans for the taxable year ending December 20, 1968, had increased considerably, and John

Shevets told him that the increase was the result of a loan participation which Lally assumed was probably the result of funds being deposited by Pennsylvania Power & Light Co. to cover the payment of dividends. Lally obtained the figures he used in the preparation of Lehigh's return from John Shevets, but he performed no analysis or audit of his own. Lally reviewed the tax return with Jeanne Zweig, an independent C.P.A. and tax consultant.[6] John Lally relied on John Shevets, in accordance with prior practice, to eliminate from the loan base any ineligible loans.

According to one of Lehigh's directors and officers, the loan participation transactions relating to the resolutions adopted on December 13 were unusual for Lehigh. Lehigh's directors, wishing to cooperate with IVB, were assured by IVB that the transactions were entirely legal, would minimize Lehigh's tax liability, and had been done by IVB in other mergers. The resolutions adopted on December 13 were proposed by IVB and not Lehigh.

Lehigh concedes that of the $17,500,000 in loan participations, $2,820,000 were ineligible for inclusion in the loan base.

### Doylestown Trust Co.

Doylestown Trust Co. (Doylestown) was a Pennsylvania corporation, having its principal place of business in Doylestown, Pa. During 1969, Doylestown merged into IVB pursuant to a tax-free reorganization under section 368(a)(1)(A).

On January 23, 1969, the directors of IVB and Doylestown adopted a joint plan and agreement of merger. On February 27, 1969, the shareholders of Doylestown and IVB adopted articles of merger.

On June 26, 1969, Doylestown acquired loan participations from IVB in the amount of $2 million. A direct loan of $200,000 was made to Central Mortgage Co., a wholly owned subsidiary of IVB. At the time of the loan, IVB could not lend to any of its subsidiaries under existing banking regulations. The participations and direct loan were approved by the executive committee of Doylestown on June 30, 1969. This approval was

---

[6] Ms. Zweig has expert knowledge of bank income taxes and has authored tax materials of special interest to those concerned with tax matters affecting banks. She was also retained by IVB and advised Leon King, who relied on her in recommending the loan participation transactions. She also prepared IVB's annual Federal tax returns.

given after the fact and without discussion because the merger was taking place. The loan participations which Doylestown undertook on June 26 were proposed by IVB.

Prior to the merger of Doylestown into IVB, Doylestown had considered the following participations:

(a) A participation with IVB in a $200,000 loan to Mack Truck, which was effected.

(b) A participation to the extent of 8.8 percent in a $2 million loan to Bucks County Industrial Corp., which was never effected.

Apparently no one at Doylestown, including Elmer C. Kates, chairman of the executive committee and president, was aware of any of the revenue rulings relating to additions to the bank's reserve for bad debts.

In order to acquire the $2 million loan participations and make the loan to Central Mortgage Co., Doylestown had to sell Government obligations, use available funds which previously were the basis for Federal funds sold, and purchase Federal funds.

On June 26, 1969, Doylestown purchased Federal funds amounting to $1,200,000. Doylestown had historically been a seller of Federal funds in 1968 and 1969 prior to its purchase of such funds on June 26, 1969. On June 27 and 30, 1969, Doylestown sold Government obligations for $5,336,329, realizing a $859,984 loss thereon.

On July 1, 1969, a certificate of merger was issued to Doylestown and IVB. IVB acquired by operation of law all of the assets of Doylestown, including loan participations, upon the merger.

Ms. Zweig prepared Doylestown's income tax return for the taxable period January 1, 1969, to June 30, 1969.

## Additions to Reserves for Bad Debts

The first question we must consider is whether respondent abused his discretion in denying Lehigh and Doylestown additions to their reserves for bad debts in 1968 and 1969, respectively, attributable to certain loan transactions. The factual pattern in these two consolidated cases is similar. On June 6, 1968, Lehigh's board of directors adopted a joint plan and agreement of merger, and on September 10, 1968, the shareholders of Lehigh and IVB adopted articles of merger. When the merger, for all practical purposes, was an accomplished fact, IVB recommended to Lehigh that it acquire $17,500,000 in loan

participations from IVB. In spite of the fact that some of Lehigh's personnel voiced concern over the tax consequences of IVB's proposal, IVB's recommendations prevailed. Lehigh acquired these loan participations on December 18, 1968. On December 23, 1968, the merger was effected, and the loan participations disappeared by operation of law. IVB resumed its status as sole owner of the loans. The factual pattern in the Doylestown merger is virtually the same, except that the bank was smaller and its officers and directors were unaware of the various tax rules and regulations governing bad debt deductions of banks. In both cases, the increased additions to the bad debt reserves increased the banks' net operating losses giving rise to loss carrybacks to earlier years.

Section 166(a) provides for the deduction of bad debts when they become worthless or, under certain circumstances, partially worthless. Section 166(c) provides that "In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts."

Historically, the treatment of a bank's bad debt reserves has been subject to various administrative pronouncements and policies. Under Mimeograph 6209, 1947-2 Cum. Bull. 26, banks were administratively permitted to establish bad debt reserves at three times their average annual loss experience. * * * In 1965, Rev. Rul. 65-92, 1965-1 Cum. Bull. 112, established a uniform reserve ratio, which was codified by the Tax Reform Act of 1969 as §585 of the Internal Revenue Code. * * *

The bad debt reserve method permits taxpayers to defer taxes on income in amounts of reasonable additions to the reserve each year, but such deferrals are justified under §166(c) only when the Commissioner is satisfied that such reserve additions are reasonable. A taxpayer attacking the Commissioner's determination that bad debt reserve additions are excessive has the burden of establishing that the additions were reasonable and that the denial of the additions was an abuse of discretion. * * * By electing to use the bad debt reserves method the taxpayer subjects himself to the reasonable discretion of the Commissioner. * * * we note that revenue rulings do not have the force and effect of law but are for the information and guidance of taxpayers, IRS officials, and others concerned, and though entitled to consideration, they are accorded less weight than regulations. * * * [*Merchants Industrial Bank v. Commissioner*, 475 F.2d 1063, 1064 (10th Cir. 1973), affg. a Memorandum Opinion of this Court.]

Rev. Rul. 65-92, 1965-1 C.B. 112, has been amplified and clarified by Rev. Rul. 66-26, 1966-1 C.B. 41, and Rev. Rul.

68-630, 1968-2 C.B. 84. The controversy in this case arises under section 9 of Rev. Rul. 68-630, which provides:

A bank may compute the addition to its reserve for bad debts on the basis of loans outstanding at the close of its taxable year, *except* that any loan outstanding on such date that is *not representative of the bank's ordinary portfolio of outstanding customer loans* must be excluded from the loan base. *If a loan is entered into or acquired for the purpose* (whether or not it is the primary purpose) *of enlarging the otherwise available bad debt deduction, it will be presumed that the loan resulting from such transaction is not representative of the bank's ordinary portfolio of outstanding customer loans.* [Emphasis added.]

IVB does not contest the validity of this ruling nor respondent's authority to issue it. While in the usual case we do not consider revenue rulings as having any particular legal significance other than as a statement of respondent's position *(Estate of Grace E. Lang,* 64 T.C. 404, 406-407 (1975), on appeal (9th Cir., Jan. 19, 1976)), in the field of bad debt reserves of banks, the applicable rules appear to have been customarily laid down by revenue ruling rather than by regulation. Since IVB does not attack this procedure, but accepts the authority of the ruling, we are not disposed to attack it on our own motion. If in some later case such an attack should be mounted, it would be appropriate for us to consider the question, and we do not mean to foreclose such consideration by anything we say here. We will, accordingly, consider the issue, as framed by the parties, to be whether Lehigh and Doylestown met the requirements of Rev. Rul. 68-630.

### A. Were Loan Participations "Representative"?

Rev. Rul. 68-630 requires that if loans are to be included in the loan portfolio against which the appropriate bad debt reserve deduction is taken, such loans must be "representative" of the loan portfolio. The obvious intention of section 9 is to prevent an artificial buildup of the bad debt reserve by taking into account loans that are not representative of a bank's ordinary loan portfolio throughout the year.

Respondent contends that the loan participations acquired from IVB by Lehigh and Doylestown are not representative of their prior portfolios, but were instead highly unusual, apparently primarily because these participations were between 2 and 3 times the size of any previous Lehigh participation and 10

times the size of any prior Doylestown participation undertaken or considered.

IVB argues that a loan participation is no different from any other kind of loan; the purchaser of an undivided interest in a loan takes the same kind of risks as a bank that is the sole lender to a borrower. Therefore, in deciding whether these participations are representative, if they are viewed the same as direct loans (and IVB argues that they should be), they would resemble other direct loans made by Lehigh and Doylestown. Moreover, Lehigh had a history of engaging in loan participations, although of a lesser magnitude. We agree that a loan participation should not be treated differently from a direct loan since the bank's risk is the same in both cases, and no reason therefore appears to make a distinction affecting the available bad debt reserve. The loan participations in IVB loans are not unrepresentative merely because they are participations rather than direct loans.

IVB implicitly concedes, as in fact it must, that even assimilating participations to direct loans, the volume of loans during the last few days prior to the merger was disproportionately high in relation to such volume during the rest of the year. IVB does not argue that the volume was representative on a purely backward-looking basis. Instead, it contends only that assuming that size is relevant in determining the representative character of the loan participations (and IVB does not claim it is not relevant), the loans were *prospectively* representative. IVB was a more aggressive lender, both prior and subsequent to the mergers, than Lehigh and Doylestown. IVB engaged in lending to the maximum of its reserves, as was evidenced by its repeated purchases of Federal funds. On the other hand, Lehigh and Doylestown were typically underloaned and sellers of Federal funds. When it became clear that Lehigh and Doylestown would become part of the IVB complex, it became equally clear that they would not be permitted to continue their previous, more conservative lending practices. In fact, prior to the mergers, Lehigh and Doylestown shifted from sellers of Federal funds to purchasers. At the same time, their assets became committed to larger loan portfolios than was the case previously by reason of the acquisition of the loan participations. Therefore, IVB argues, since the acquisition of the loan participations by Lehigh and Doylestown prior to the mergers was a reflection of a shift to more aggressive lending by these banks, the loan portfolios should

be viewed prospectively in the light of such shift to more aggressive lending.

The difficulty with IVB's argument is that, however representative the new lending might be of IVB's operations, the issue here is whether it was representative of *Lehigh's* and *Doylestown's* operations. These two banks were about to go out of existence when they purchased the loan participations. The participations were to be held for only a very brief period and then to revert to IVB. The mere fact that a bank substantially increases its loans (direct or participation) should not preclude it from at the same time increasing its bad debt reserve to accommodate increased bad debts arising from such loans, if the increase was connected to a bona fide permanent shift in policy. Had IVB kept Lehigh and Doylestown as subsidiaries, and had they retained their heavily loaned posture, we might have been prepared to take IVB's "prospective look" theory more seriously. But Lehigh and Doylestown had no prospect but extinction when they made their purchases. The postmerger carryover of various tax attributes after the merger does not alter the fact. IVB here seeks to create a loss to be carried back to earlier years of the acquired companies. The sole issue is whether the loans were representative or not of the operations of the *acquired* corporations, not of IVB, and the acquiring corporation may not swell Lehigh's and Doylestown's deductions by endowing them with its own experience, prior or subsequent. It would be clear to us that a practice of yearend inflation of loans outstanding, closely followed by reductions the next year, would not be deemed "representative" of the entire year's results. We see no reason why Lehigh and Doylestown should fare better because their years ended through merger and their new loans were returned to IVB through the merger process rather than simply being resold. We conclude that the premerger increase in the banks' loans (or participation) was unrepresentative of their ordinary portfolio of customer loans. Consequently, under Rev. Rul. 68-630, it should not be taken into account in computing the loan base.

Because we find the new loans to be unrepresentative even without regard to tax-avoidance motive, we need not consider whether IVB has met its burden of persuading that no such motive was present.

## B. *Doylestown's Loan to Central Mortgage Co.*

Doylestown's $200,000 loan to IVB's subsidiary, Central Mortgage Co., was made, according to IVB, because IVB could not make the loan directly under bank regulations. Certainly there is a business reason for the loan, apart from tax purposes. Respondent argues that the loan should be held unrepresentative because it was made to circumvent bank regulations and because it was made to increase Doylestown's bad debt deduction. We conclude that the primary reason the loan was made was to make money available to Central Mortgage Co. which IVB could not do directly, and that obtaining an enlarged tax deduction was not a substantial reason for the transaction. Under the circumstances, Doylestown's $200,000 loan to Central Mortgage Co. is a representative loan.

## *Negligence Penalty Under Sec. 6653(a)*

Section 6653(a) provides for the imposition of a 5-percent addition to tax where the taxpayer had underpaid part of his taxes as a result of negligence or intentional disregard of the rules or regulations. Respondent contends IVB disregarded Rev. Rul. 68-630. IVB asserts that, even if proved wrong on the merits, its position was reasonably adopted. Furthermore, IVB relied on an expert in bank income taxes, Jeanne Zweig, who was aware of the actions being taken. Jeanne Zweig advised IVB to the best of her ability, and Leon King on behalf of IVB relied on her advice. Reasonable reliance on the advice of an expert suffices to avoid the negligence penalty. *Conlorez Corp.,* 51 T.C. 467, 474-475 (1968); *Leo A. Woodbury,* 49 T.C. 180, 199-200 (1967). We sustain IVB on this issue.

*Decisions will be entered under Rule 155.*