PAUL D. HOPKINS AND CHERYL D. HOPKINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hopkins v. Commissioner
Docket No. 15474-88
United States Tax Court
T.C. Memo 1992-134; 1992 Tax Ct. Memo LEXIS 197; 63 T.C.M. (CCH) 2297; T.C.M. (RIA) 92134; March 9, 1992, Filed *197 Decision will be entered under Rule 155. Mark E. Gammons, for petitioners. Dawn M. Krause, for respondent. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case has been assigned to Chief Special Trial Judge Marvin F. Peterson pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 183. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the Chief Special Trial Judge's opinion, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PETERSON, Chief Special Trial Judge: Respondent determined deficiencies in petitioners' income taxes and additions to tax as follows: Cheryl D. Hopkins
Increased Interest and
Year
Deficiency
Additions to Tax
1980
$ 3,885.81
Sec. 6653(a)
$ 3,885.81
Sec. 6659(a)
1,165.74
Sec. 6621(c)
applicable
Paul D. Hopkins
Increased Interest and
Year
Deficiency
Additions to Tax
1980
$ 7,929.19
Sec. 6653(a)
$ 396.46
Sec. 6659(a)
2,378.76
Sec. 6621(c)
applicable
1981
$ 2,121
Sec. 6653(a)(1)
$ 106.05
Sec. 6653(a)(2) [1]
Sec. 6659(a)
636.30
Sec. 6621(c)
applicable
*198 Paul D. Hopkins and Cheryl D. Hopkins
Increased Interest and
Year
Deficiency
Additions to Tax
1983
$ 2,620
Sec. 6653(a)(1)
$ 131.00
Sec. 6653(a)(2) [1]
Sec. 6659(a)
384.30
Sec. 6621(c)
applicable
1984
$ 2,028
Sec. 6653(a)(1) [2]
$ 101.40
After concessions by petitioners, the issues remaining for decision are: (1) Whether petitioners are entitled to a deduction under section 165(c)(2) for cash expenditures made for an investment which was an economic sham; and (2) whether petitioners are liable for additions to tax pursuant to sections 6653(a) and 6659, and for increased interest pursuant *199 to section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners resided in Chesterland, Ohio, when the petition in this case was filed. During 1981, Structured Shelters, Inc. (SSI), marketed an investment entitled Children's Classic Series (1981 Record Promotion). This promotion involved the leasing of master recordings of children's stories for the purpose of producing record albums, described in detail in Rybak v. Commissioner, 91 T.C. 524 (1988). SSI used sales agents, called Chartered Representatives, to market various tax-motivated investments, including the 1981 Record Promotion. Thomas A. Graham (Mr. Graham) was a Chartered Representative of SSI. The master recordings used in the Children's Classic Series were purchased by Oxford Productions (Oxford) for $ 454,120. The purchase agreement required a cash payment in the amount of $ 7,000 and the execution of a nonrecourse note in the amount of $ 447,120. The cost to produce each master recording was $ 1,635.50. Oxford leased the master recordings to investors of *200 the 1981 Record Promotion for an 8-year term. The lease required an advance rental payment of $ 10,000 in cash plus 25 percent of all gross revenues during the lease period. A part of the 1981 Record Promotion included a distribution agreement between the investors and Aim Record Distribution (Aim) which provided that Aim would produce and market the records. The investors agreed to pay Aim $ 2,500 cash plus 10 percent of the gross receipts from record sales. Of the $ 2,500 payment, 15 percent was allocated to the cost of producing the record album jacket. Aim developed artwork for the album jackets for the 1981 Record Promotion investors. During 1984, SSI, on behalf of the 1981 Record Promotion investors, sold the rights to reproduce the artwork and to use the titles of the record albums to Sonya, Inc. (Sonya), for $ 100,000 for each title. The purchase price consisted of a cash payment of $ 10,000, and the assumption of a $ 6,000 note, and the balance of $ 84,000 was payable from future sales of children's cassette tapes. The $ 100,000 sales price was an arbitrary figure which had no relationship to the value of the right to use the titles sold to Sonya. Neither SSI nor *201 the 1981 Record Promotion investors had the exclusive rights to the record titles or to the artwork sold to Sonya. Graham and his spouse owned 65 percent of the stock in Sonya. During 1984, SSI and Graham began to market an investment called Children's Classics Audio Cassettes (CCAC). There were two phases to this progaram. The first phase involved the production of master recordings (CCAC Production Phase) using the titles and artwork purchased by Sonya from the 1981 Record Promotion investors. The second phase involved leasing the master recordings (CCAC Lease Phase) from the CCAC Production Phase investors to produce cassette tapes. An integral part of the scheme was Sonya's sale in December 1984 to the CCAC Production Phase investors (1984 CCAC Production Phase) of the right to reproduce the artwork and to use the record titles which it had purchased from the 1981 Record Promotion investors. The sales price was $ 103,000 for each title. The sales agreement required a cash payment of $ 13,000 with the balance due of $ 90,000 to be paid within 5 years from future sales of cassette tapes. Each CCAC Production Phase investor entered into an agreement with Skeets Music (Skeets) *202 under which Skeets agreed to produce the master recordings and artwork for $ 20,000, of which $ 5,000 was paid in cash and the balance was to be paid from future sales of cassette tapes. Also, a marketing agreement was entered into with Marketing Complex, Inc. (MCI), to develop an advertising plan for the cassette tapes. The investors agreed to pay MCI $ 7,500, of which $ 1,500 was paid in cash, and a $ 6,000 promissory note due in 5 years was executed for the balance due. During 1984, the CCAC Production Phase investors leased to the CCAC Lease Phase investors (1984 Lease Phase) the right to produce cassette tapes from the master recordings developed for the 1984 CCAC Production Phase investors. The lease was for a term of 5 years and required the lessee to pay $ 1 each for a minimum of 10,000 tapes. A cash payment of $ 2,500 was paid and the balance of $ 7,500 was due in 5 years. The 1984 CCAC Lease Phase investors entered into an agreement with MCI to develop an advertising plan. The investors agreed to pay MCI $ 7,500, of which $ 1,500 was paid in cash and a $ 6,000 promissory note due in 5 years was executed for the balance due. During 1985, Sonya sold additional record *203 titles and artwork to CCAC Production Phase investors (CCAC 1985 Production Phase) for $ 115,000 per title. The agreement provided for a cash payment of $ 25,000 with the remaining balance due of $ 90,000 to be paid within 5 years from the future sales of cassette tapes. Included in the sale price was the production cost of $ 5,000 which Sonya paid directly to Skeets. None of the investors entered into production agreements to produce master recordings. The 1985 CCAC Production Phase investors entered into an advertising agreement with MCI to develop an advertising plan. The investors agreed to pay MCI $ 7,500 of which $ 1,500 was paid in cash, and a $ 6,000 promissory note due in 5 years was executed for the balance due. During 1985, the CCAC 1984 and 1985 Production Phase investors leased to the CCAC Lease Phase investors (1985 CCAC Lease Phase investors) the right to produce cassette tapes from the master recordings purportedly developed for the 1984 and 1985 CCAC Production Phase investors. The lease was for a period of 5 years and required the lessee to pay $ 1.67 each for a minimum of 10,000 tapes. A cash payment of $ 4,175 was paid, and the balance of $ 12,525 was to *204 be paid from future sales of cassette tapes during the term of the lease. The 1985 Lease Phase investors entered into an agreement with MCI to develop an advertising plan. The investors agreed to pay MCI $ 8,000, of which $ 2,000 was paid in cash, and a $ 6,000 promissory note due in 5 years was executed for the balance due. The cassette tapes and artwork were primitive, of very poor quality, and clearly substandard to cassette tapes sold in the customary retail market. As of the date of trial, there had been no sales of such cassette tapes. Because of their poor quality, it was highly unlikely that there would ever be a market for cassettes tapes produced from the master recordings leased by the investors. Under these circumstances the master recordings, leases, and artwork had no commercial value. The total amount of cash invested by the 1984 CCAC Production Phase investors was $ 19,500 for each master recording. The total amount of projected tax benefits for each investor was between $ 115,000 and $ 119,000. The total amount of cash invested by the 1985 CCAC Production Phase investors was $ 27,000 for each master recording. The total amount of projected tax benefits for *205 each investor was $ 126,300. The total amount of cash invested by the 1984 CCAC Lease Phase investors was $ 4,000 for each lease. The total amount of projected tax benefits for each investor was $ 17,500. The total amount of cash invested by the 1985 CCAC Lease Phase investors was $ 6,175 for each lease. The total amount of projected tax benefits for each investor was $ 24,700. During 1984, petitioners, as tenants in common, entered into an agreement with CCAC Production Phase investors to lease for $ 10,000 the rights to produce cassette tapes from a master recording entitled "Johnny Appleseed". Under the 1984 CCAC Lease Phase program, petitioners made a cash payment of $ 4,000 and expected to receive tax deductions in the amount of approximately $ 17,000 for their investment in the master recording lease. For the year 1984 petitioners claimed a deduction on their tax return in the amount of $ 18,000, which related to the master recording investment. At the time of the investment in the master recording, petitioners had no background or knowledge of the record or tape cassette business. Petitioners did not make any investigation concerning the nature or the profitability *206 of the CCAC investment and accepted at face value Mr. Graham's statement that it was a good investment program. Petitioners failed to review the various documents they signed and did not negotiate any of the contract terms. Petitioners did not investigate the experience or the financial backgound of any of the entities involved in the CCCAC tansactions to determine whether such entities had the capability to produce and distribute cassette tapes in the retail market. Petitioners made no attempt to obtain an appraisal of the master recording lease, or make any other investigation to determine its value. Petitioners made no attempt to verify either Mr. Graham's tax advice with an independent tax authority, or whether Mr. Graham had any experience in the recording business or was knowledgeable in investment or tax matters. Petitioners have little or no experience in tax matters. Petitioners' decision to invest in the 1984 CCAC Production Phase was not based on a profit motive, but on the promised tax benefits. OPINION Petitioners admit that the investment made in the 1984 CCAC Production Phase had no economic substance and agree that they are not entitled to any credits or deductions *207 based on this investment. However, petitioners contend that they are entitled to deduct the cash payment made for their investment under section 165(c)(2) on the ground that a loss was incurred in a transaction entered into for profit. Although admitting that the transaction was an economic sham, petitioners contend that they had no knowledge at the time they entered into the transaction that the investment lacked economic substance. Petitioners argue that tax motivation was incidental to the CCAC investment because they felt that the investment would have a good return from the sale of cassette tapes without regard to the tax benefits. Further, petitioners argue that because of their lack of knowledge in investments and tax planning, it is clear that they relied on the reputation of Mr. Graham, as an expert in investment matters, that there would be substantial earnings and profits form the sale of cassette tapes. Respondent argues that petitioners have failed to show that a loss was sustained, or the amount of any loss as required under section 165(c)(2). In addition, respondent contends that petitioners have failed to show that they had a profit motive when they entered into *208 the CCAC transaction. The transaction involved in the instant case is a continuation of the tax shelter promotion scheme by SSI concerning master recordings of children's records described in detail in Rybak v. Commissioner, 91 T.C. 524 (1988). In the original 1981 promotion the investors produced master recordings for the alleged purpose of producing and distributing records in the children's retail market which the Court found was an economic sham. In the instant case petitioners acquired a lease of a master recording from CCAC Production Phase investors to produce cassette tapes. The facts in this case are essentially the same as set forth in Rybak v. Commissioner, supra. The only material difference is that in the instant case petitioners acquired a lease which had been acquired through SSI to produce children's cassette tapes. Petitioners admit that this transaction was without economic substance the same as in the Rybak case. Because of petitioners' admission that the transaction lacked economic substance, petitioners cannot prevail notwithstanding their subjective profit motive. See Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987), *209 where we held that the presence of an individual's subjective profit motive does not require the recognition for tax purposes of a transaction which lacks economic substance. In Jackson v. Commissioner, T.C. Memo. 1991-250, we denied a deduction for "out of pocket cash losses" on the ground that the transaction lacked economic substance and stated that subjective intent of a profit cannot supply economic substance to a business transaction. Also, in Shriver v. Commissioner, 899 F.2d 724 (8th Cir. 1990), affg. T.C. Memo. 1987-627, the court concluded, as an alternative basis for its holding that the deductions claimed were not deductible, that where there is a clear finding of a lack of economic substance it is enough, standing alone, to support a decision that a deduction is not allowable. In Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985), the Court of Appeals held that if a transaction is a complete sham, then such niceties as whether the test (for whether a transaction is "entered into for profit") is an objective or subjective *210 one are simply not involved. Regardless of the definition, the transaction must be bona fide before losses are deductible. For the above reasons, we sustain respondent's determination that petitioners are not entitled to a loss deduction for the year 1984 for the cash payment invested in the CCAC transaction under section 165(c)(2) because the transaction lacked economic substance and was not entered into for profit. Additions to Tax
Section 6653(a)
Respondent determined that petitioners are liable for additions to tax for negligence under sections 6653(a) and 6653(a)(1) and (2). Sections 6653(a) and 6653(a)(1) impose an addition to tax if any part of an under payment of tax is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes an additional amount, but only with respect to the portion of the underpayment attributable to the negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners contend that they were not negligent because they placed their reliance *211 completely on Mr. Graham, the sales representative of SSI, who petitioners felt had a good reputation in tax and investment matters. We agree that reliance on the advice of professionals may defeat a finding of negligence under certain circumstances. Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). See Coleman v. Commissioner, T.C. Memo. 1990-511. Petitioners have the burden of proof to show that they were not negligent. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). There is no evidence in this record that Mr. Graham had any experience in the record or cassette tape recording business. Petitioners made no attempt to personally verify whether Mr. Graham had any such experience, or whether he was knowledgeable in investment and tax matters. Petitioners have testified that they relied on Mr. Graham's reputation when they entered into the transaction. However, petitioners failed to explain the basis for their complete faith in Mr. Graham's reputation. Apparently, petitioners did not see any conflict in the fact that Mr. Graham had a financial interest in the transaction. Under these *212 circumstances, reasonable caution dictates that further inquiry be made to verify the accuracy of the tax and investment information received. We do not believe that petitioners would have committed approximately $ 17,000 to this transaction without seeking independent advice if they were truly concerned about their investment, other than for the tax benefits involved. We find no evidence that petitioners' actions were prudent or reasonable under the circumstances of this case. Accordingly, petitioners are liable for the additions to tax for negligence as determined by respondent. Section 6659
Section 6659 imposes a graduated addition to tax whenever an individual has an under payment of tax which equals or exceeds $ 1,000 and which is attributable to a valuation overstatement. A valuation overstatement occurs when "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)". Sec. 6659(c). Petitioners argue that the addition under section 6659 does not apply to this case because the underpayment is attributable to *213 claiming an improper deduction rather that to a valuation overstatement. In the instant case, the deduction was disallowed because the transaction lacked economic substance, and it was found that the property was overvalued. Where there is a lack of economic substance, section 6659 will apply because the correct basis is zero and any basis claimed in excess of that is a valuation overstatement. Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Gilman v. Commissioner, T.C. Memo. 1990-205, affd. 933 F.2d 143 (2d Cir. 1991). In affirming Gilman v. Commissioner, supra, the Court of Appeals agreed with the proposition that where a deduction is disallowed due to the lack of economic substance and where the lack of economic substance is due in part to an overvaluation, the deficiency is attributable to a valuation overstatement under section 6659. Gilman v. Commissioner, 933 F.2d at 151. See also Harness v. Commissioner, T.C. Memo. 1991-321. Accordingly, petitioners are liable for the additions to tax for valuation overstatements as determined by respondent. Increased Interest
*214 Petitioners contest the increased interest under section 6621(c) on the ground that petitioners intended to make a profit on the transaction. Petitioners admit that there was a valuation overstatement of more than 250 percent, see sec. 6621(c)(3)(A)(i), and we have concluded that the deduction was not allowable because the transaction lacked economic substance and was tax motivated. Transactions which lack economic substance or business purpose are sham transactions under section 6621(c)(3)(A)(v). McCrary v. Commissioner, 92 T.C. 827, 857 (1989); Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Accordingly, petitioners are liable for the increased interest under section 6621(c). Decision will be entered *215 under Rule 155. Footnotes
1. 50 percent of the interest due on $ 2,121.↩
1. 50 percent of the interest due on $ 2,620. ↩
2. Respondent did not determine in the notice of deficiency that petitioners were liable for the addition to tax under section 6653(a)(2).↩