VIRGIL E. AND LORRAINE REINHARDT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reinhardt v. Commissioner
Docket No. 12321-92
United States Tax Court
T.C. Memo 1993-397; 1993 Tax Ct. Memo LEXIS 408; 66 T.C.M. (CCH) 566; August 30, 1993, Filed *408 Decision will be entered under Rule 155. For petitioners: Raymond N. McCabe and Edward M. Griffith, Jr.
For respondent: Matthew I. Root. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: The primary issue in this case is whether additions to tax for either fraud or negligence apply to petitioners, who were distributors for the Buffalo News during the years at issue. Respondent determined deficiencies in petitioners' Federal income tax of $ 3,487 for 1986, $ 5,498 for 1987, $ 6,677 for 1988, and $ 6,281 for 1989. Respondent determined additions to tax for fraud under section 6653(b)(1)(A) of $ 2,510 for 1986 and $ 3,686 for 1987, under section 6653(b)(1)(B) in amounts to be determined for 1986 and 1987, under section 6653(b)(1) of $ 4,446 for 1988, and under section 6663 of $ 4,345 for 1989. Respondent determined in the notice of deficiency and asserted in the answer other additions to tax and penalties as described below. Petitioners concede that respondent's determination of deficiencies in their income tax for 1986, 1987, 1988, and 1989 is correct, and that they are liable for the additions to tax for substantial understatement of tax under section 6661 *409 for 1987 and 1988. The issues for decision are: (1) Whether petitioners are liable for additions to tax for fraud under section 6653(b) for 1986, 1987, and 1988, and under section 6663 for 1989. We hold that they are not. (2) Alternatively, whether petitioners are liable for additions to tax for negligence under section 6653(a) for 1986, 1987, and 1988. We hold that they are not. (3) Whether petitioners either were negligent or substantially underpaid their tax for 1989, and thus are liable for the accuracy-related penalty under section 6662(a). We hold that they are. Respondent bears the burden of proof on the negligence and substantial underpayment additions to tax and the accuracy-related penalty because they were first raised in respondent's answer. Rule 142(a). Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
Petitioners resided in Lancaster, New York, when they filed the petition. Petitioners were married in 1969 and continue to live in the home they bought in *410 1972. Petitioners have three sons who were teenaged or younger during the years in issue. Mr. Reinhardt has a high school education. He has had no business or accounting courses. He has worked at a variety of unskilled and semi-skilled jobs such as a gas station attendant. He was drafted in 1966 and served in the Armed Forces from 1966 to 1968. In 1968 he resumed work in a gas station. He worked in a factory as a laborer (e.g., shoveling sand) from about 1970 to 1982. In 1982 the factory closed. Mr. Reinhardt has filed tax returns as required throughout his adult life, including for the years in issue. However, he has never prepared a return. He has always used a tax preparer. He does not trust himself to correctly prepare a tax return. Mrs. Reinhardt has a sixth grade education and has had no accounting training. 2. Distribution of Newspapers by Petitioners
The Buffalo News distributes newspapers through employees and through independent dealers who are independent contractors. Petitioners were independent dealers for the Buffalo News. They purchased newspapers from the Buffalo News and resold them at a profit. Mrs. Reinhardt distributed the Buffalo News *411 from 1981 to 1991. Mr. Reinhardt distributed the Buffalo News from 1982 to 1989. They served home delivery customers and single copy outlets. Petitioners used youth carriers to deliver papers to about three-fourths of their home delivery customers. Mr. Reinhardt collected from his own customers and from the youth carriers who collected from their customers. Each week petitioners paid the Buffalo News a wholesale rate for newspapers sold. Independent dealers made the payment to their district manager. Seventy-five to ninety percent of petitioners' collections were in cash. Petitioners each had a checking account during the years they distributed papers. They regularly deposited more than three-fourths of their gross receipts in their checking accounts during the years in issue. Both petitioners regularly kept the check register for these accounts throughout the years in issue, recording deposits and the payee of each check. Both petitioners wrote checks from their checking accounts to pay family expenses, such as the mortgage, utilities, home maintenance, food, clothes, and their children's educational expenses. Both petitioners received a weekly circulation statement from *412 the Buffalo News, which they paid with checks drawn on their checking accounts. The circulation statements showed the number of papers and total charges to petitioners for papers drawn by them, and gave various credits. For example, there was a car allowance credit based on petitioners' use of cars to distribute papers; a coupon credit to compensate petitioners for delivery to new customers using coupons in lieu of payment; a subscriber credit, applicable, for example, if a phony subscription was placed through the telemarketing service; and a credit for returns of unsold papers from single copy outlets. Mr. Reinhardt knew that credits appeared on the weekly statements. The Buffalo News had a general policy of having district managers interview their new independent dealers when they signed their independent dealer agreement to explain the agreement and to inform them of various aspects of being a dealer, such as the independent dealer's responsibility to keep records. The interviews usually lasted about 25 minutes to 1 hour. The policy of the Buffalo News was not to give tax advice to independent dealers or to discuss the distributor's tax return. When Mr. Reinhardt signed *413 his dealer agreement, the interview lasted only 5 or 10 minutes and included no discussion of recordkeeping or taxes. When Mrs. Reinhardt became an independent dealer, no one from the Buffalo News discussed gross receipts or taxes with her. During the years at issue and before, Mr. Reinhardt never had a meeting with anyone from the Buffalo News to discuss business or tax matters, and never received correspondence from the Buffalo News on business or tax matters. Petitioners each received Forms 1099 from the Buffalo News indicating payment to them of $ 4,183 for 1986, $ 4,412 for 1987, $ 4,688 for 1988, and $ 2,298 for 1989. Petitioners did not receive Forms W-2 from the Buffalo News for the years in issue. 3. Petitioners' Income Tax Returns
Mr. Reinhardt always arranged for a tax preparer to prepare petitioners' Federal income tax returns. Petitioners' Federal income tax returns were prepared by Charles J. Mendola (Mendola) for tax years 1985 (or earlier) to 1988. Mendola usually scheduled his clients for interviews lasting 1-1/2 hours. He prepared the return during the interview. Mr. Reinhardt attended the interview and brought the Forms 1099, interest and bank statements, *414 house payment records, and some other bills. Mr. Reinhardt brought no other records. Mendola knew that petitioners delivered papers, but never asked Mr. Reinhardt any questions about his newspaper income. Mr. Reinhardt never told Mendola he incurred business, utility, rental, or car and truck expenses, or to deduct a certain amount for entertainment. Mendola claimed some deductions on petitioners' Schedules C to which they were not entitled, such as for travel and entertainment, meals, truck expenses, and rental expenses. Mendola knew petitioners had bank accounts but never saw their checkbooks. Mr. Reinhardt never refused any request for information by Mendola. Mendola believed Mr. Reinhardt was extremely unsophisticated. Mendola became sick before the filing season for tax year 1989. He referred about 30 clients to the accounting firm Buccieri and Buccieri. The Buccieri firm found errors on many of the returns Mendola had prepared. The firm had difficulty with the Mendola referrals because Mendola had claimed larger deductions (e.g., charitable deductions and miscellaneous deductions) and obtained larger refunds for many of them than did the Buccieri firm for 1989. The *415 Buccieri firm could find no explanation for why the 1988 deductions claimed were so high compared to 1989. Petitioners' 1989 return was prepared by Carol A. Pope (Pope) of the Buccieri firm. That was her first year preparing returns for clients. Pope's tax training consisted of a 10-week course sponsored by a national tax return preparation company. Pope's firm assigned her to prepare some of the simpler tax returns. Under her firm's procedures, her returns were to be reviewed by one of the C.P.A.'s and signed by them as the preparer. However, contrary to this procedure, Pope signed as preparer of petitioners' 1989 return. Buccieri and Buccieri's procedure was to give clients a 15-page income tax organizer to complete and bring to their interview. Mr. Reinhardt completed very little of the organizer. The only section he completed was the personal information section. He either left the remainder of the organizer blank or included a few entries. For example, he left pages 4, 7, 9, 12, and 13 completely blank. He included only sporadic entries in the remainder of the organizer. For example, he only had a single entry on each of pages 3, 5, and 6. On page 8, he made three *416 entries about employee business expenses. On page 11, under self-employed income and expense, he entered $ 2,298 next to "BEN", presumably for the Buffalo Evening News. Under self-employed expenses he claimed $ 35 for accounting and legal and $ 434 for automobile expenses. He answered eight out of nine yes or no questions on page 14. He also signed at the bottom of the last page. He completed no other sections. He also gave the firm a copy of his 1988 return and the Forms 1099 for 1989. Petitioners were audited around 1990. They took their bills from the Buffalo News and their checkbooks to the interview. The auditor did not ask to see their bank records. Examiner C.N. Luther prepared an examination report dated June 29, 1990, which said in part: TP's approximately 50 years old. No obvious health problems. Neither has any bookkeeping or accounting training or experience. Both appeared to be befuddled when questioned about why income in question was not reported. Both appeared confused about income and expenses on Schedule C.
The examiner asked: "Why didn't you report income?" Petitioners answered: "It's cash income" and "everybody told us cash income doesn't *417 have to be reported." The examiner asked if petitioners discussed it with their preparer and petitioners said no. The examination report does not suggest petitioners failed to cooperate in any way. Around February 16, 1991, petitioners executed a Form 2848, appointing Nicholas D. Buccieri (Buccieri), a C.P.A. with Buccieri and Buccieri, to represent them in dealing with the Internal Revenue Service (IRS) for the years 1986 to 1989. Buccieri first reviewed the return prepared by Pope in early 1991. Pope left the Buffalo area around the summer of 1991. Petitioners erroneously believed their reporting obligation was limited to the amounts shown on their Forms 1099. Neither anyone from the Buffalo News nor petitioners' tax preparers for the years at issue told petitioners that they should report their gross receipts and cost of goods sold. During the years in issue, petitioners received but did not report gross receipts of $ 93,206 for 1986, $ 108,321 for 1987, $ 118,264 for 1988, and $ 68,530 for 1989 from the sale of newspapers. They had, but did not report, cost of goods sold expenses of $ 76,680 for 1986, $ 86,050 for 1987, $ 96,930 for 1988, and $ 47,454 for 1989. Petitioners *418 maintained no books and records for their newspaper distributor activity during the years in issue other than their checkbooks. However, petitioners did not conceal their newspaper distributor activity or bank records from their tax preparers or the IRS examiner. OPINION The parties agree that respondent's determination of deficiencies in petitioners' income tax liabilities is correct. 1. Fraud
Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). For returns due after December 31, 1986, but before January 1, 1989 (e.g., petitioners' returns for 1986 and 1987), there is an addition to tax for fraud of 75 percent of the portion of the underpayment, which is attributable to fraud, plus 50 percent of the interest payable under section 6601, which is attributable to such position. Sec. 6653(b)(1)(A) and (B). For returns due after December 31, 1988, and before January 1, 1990 (e.g., petitioners' 1988 return), there is an addition to tax of 75 percent of the underpayment which is attributable to fraud. Where respondent shows that any of the underpayment was due to fraud, there is a rebuttable presumption that the entire *419 underpayment is due to fraud. Sec. 6653(b)(2). For returns due after December 31, 1989 (e.g., petitioners' 1989 return), there is a penalty of 75 percent of the underpayment attributable to fraud similar to the addition to tax for fraud applicable for the previous year under section 6653(b)(1). Sec. 6663(a). To prove fraud, respondent must establish that: (1) Petitioners have underpaid taxes for each year, and (2) some part of the underpayment was due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). Respondent need not prove the precise amount of the underpayment resulting from fraud. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). Respondent need only prove that "any part" of an underpayment results from fraud. Secs. 6653(b) and (c), 6663(a). For purposes of section 6653(b), fraud means "actual, intentional wrongdoing," Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), or the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owing, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), *420 affg. T.C. Memo. 1966-81; McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Fraud is never presumed; rather, it must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may be inferred from any conduct, the effect of which is to mislead or conceal, Spies v. United States, 317 U.S. 492, 499 (1943), or where an entire course of conduct establishes the necessary intent, Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Kotmair v. Commissioner, 86 T.C. 1253, 1260 (1986); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The sophistication of the taxpayer is relevant in deciding if a taxpayer has committed fraud. Halle v. Commissioner, 175 F.2d 500, 502-503 (2d Cir. 1949), affg. 7 T.C. 245 (1946). Fraudulent intent is more easily inferred where the taxpayer *421 is intelligent, educated, and knowledgeable about taxes. Simms v. Commissioner, 422 F.2d 340 (4th Cir. 1970), affg. T.C. Memo. 1968-298; O'Connor v. Commissioner, 412 F.2d 304, 310 (2d Cir. 1969), affg. in part and revg. in part T.C. Memo. 1967-174. Respondent points out that petitioners' returns did not include gross receipts or the cost of goods sold and included erroneous claims for deductions in the years in issue. Respondent argues that it is unbelievable petitioners would think that the small amounts reported on their Forms 1099 and 1040 were correct in light of the fact that: (1) Petitioners received a large amount of money for distributing about 200,000 newspapers per year; (2) personal expenses paid from petitioners' accounts exceeded their reported income; (3) petitioners' mortgage expenses and food expenses were 15 times greater than their taxable income in 1986 and 3 times greater than their taxable income for 1987; and (4) Mr. Reinhardt knew he was making money and a decent living. Respondent also argues that the fact that petitioners knowingly deposited *422 their customers' payments and kept check registers shows that petitioners knew the receipts were business gross receipts, includable in income. We do not believe that petitioners made this connection. We believe respondent's position gives insufficient consideration to the particular circumstances plainly shown here. Petitioners are clearly unsophisticated and have little understanding of the tax laws. They have always recognized their obligation to file and have filed returns. However, they have never prepared their returns; they have always relied on a paid preparer. Most of petitioners' receipts from their customers were in cash. They regularly deposited more than three-fourths of their gross receipts in their checking accounts. Petitioners kept check registers in which they regularly recorded their weekly deposits of checks and cash and payees of checks they wrote. The existence of petitioners' check registers shows that petitioners regularly maintained records of their newspaper distribution activity. Respondent argues that the fact that petitioners kept check registers shows "a degree of business acumen * * * directly contradicting their claimed ignorance of the finances *423 of the newspaper business." We disagree. The ability to keep a check register, i.e., to record checks and deposits, does not show business acumen relating to the newspaper business. We also note that there is no evidence that petitioners misled or failed to cooperate fully with the IRS examiner. We are convinced the blame for the errors on the returns lies with Mendola, not petitioners. Mendola testified that, for the 1986 return, Mr. Reinhardt gave him a $ 377 figure for insurance for a truck used for business. Mr. Reinhardt told Mendola that Mr. Reinhardt used a room in his house for papers, and Mendola chose the number to deduct for it. Mendola testified that "I gave him $ 92" for expenses of refreshments, etc., for youth carriers, even though Mr. Reinhardt did not suggest an amount. Mendola knew that petitioners distributed papers and that they had checking accounts. He testified that Mr. Reinhardt told him he had no cost of goods sold and that he thought Mr. Reinhardt was extremely unsophisticated. However, he apparently made no effort to see the check registers or petitioners' Buffalo News statements. If he had, he would have had access to considerable detail about *424 their gross receipts and costs of goods sold. Buccieri testified that in 1991 when he first reviewed the 1988 return prepared by Mendola, he could easily see it was not complete because it contained no cost of goods sold information. Someone more sophisticated than Mr. Reinhardt would have realized that Mendola was doing a poor job. We believe Mr. Reinhardt did not realize it. Mr. Reinhardt testified that he used tax preparers because he did not believe he could prepare a tax return accurately. We think his reliance on preparers was total. He testified that he believes income is not taxable unless there is a Form 1099 or W-2. That belief is wrong, but respondent has not convinced us that Mr. Reinhardt knew it was wrong. Petitioners did not know that their gross receipts and costs of goods sold must be reported. Based on all the facts here, we conclude that respondent has not clearly and convincingly proven fraud for any year in issue. 2. Negligence for Tax Years 1986 to 1988
In the answer, respondent alleged that, as an alternative to the addition to tax for fraud, petitioners are liable for negligence under section 6653(a)(1)(A) and (B) for 1986 and 1987, section *425 6653(a)(1) for 1988, and section 6662(b)(1) for 1989. Respondent has the burden of proving that petitioners are liable for negligence because respondent first raised negligence in the answer. Rule 142(a). Thus, respondent must prove that petitioners intentionally disregarded rules and regulations or that petitioners acted unreasonably, imprudently, and without due care in filing their returns. Sec. 6653(a). For returns due before 1990, if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations, an addition to tax of 5 percent of the underpayment is added. Sec. 6653(a). For returns due before 1989, there is also added an amount equal to 50 percent of the interest payable under section 6601 on the portion of the underpayment attributable to negligence. Sec. 6653(a). Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In deciding whether a taxpayer was negligent or intentionally disregarded rules and regulations, it is appropriate for the Court to consider the taxpayer's *426 experience and knowledge. Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973); Sutor v. Commissioner, 17 T.C. 64, 69 (1951); Lagoy v. Commissioner, T.C. Memo. 1992-213; DeRochemont v. Commissioner, T.C. Memo. 1991-600; Kerr v. Commissioner, T.C. Memo. 1990-155; Whitaker v. Commissioner, T.C. Memo. 1988-418; Dexter v. United States, 306 F. Supp. 415, 428 (N.D. Miss. 1969) (no negligence where taxpayer with limited education and business acumen relied on accountant and lawyer). Taxpayers may not be negligent if they rely in good faith on tax professionals, they provide their agents with all information necessary to prepare the return, and the incorrect return is the result of the preparer's mistakes. Weis v. Commissioner, 94 T.C. 473, 487 (1990); Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976); Pessin v. Commissioner, 59 T.C. 473, 489 (1972). *427 A taxpayer's honest misunderstandings of law and fact coupled with his reliance on financial advisers may not be negligence. See Vorsheck v. Commissioner, 933 F.2d 757, 758-759 (9th Cir. 1991), affg. in part and revg. in part an Oral Opinion of this Court; Otis v. Commissioner, 73 T.C. 671, 675 (1980); Woody v. Commissioner, 19 T.C. 350, 355 (1952) (Court reviewed); Lyons v. Commissioner, T.C. Memo. 1991-84; Scotten v. Commissioner, T.C. Memo. 1966-206, affd. 391 F.2d 274 (5th Cir. 1968). Petitioners credibly testified that they did not understand the law and that they relied in good faith on their return preparers. Respondent has not convinced us that petitioners' reliance on the return preparers was unreasonable or not in good faith. We conclude that petitioners are not liable for the addition to tax for negligence for 1986, 1987, or 1988 under section 6653(a). 3. The Accuracy-Related Penalty for Tax Year 1989
In 1989, the additions to tax for negligence under section 6653(a), valuation *428 overstatement under section 6659, and substantial understatement of tax liability under section 6661 were replaced with an accuracy-related penalty. Sec. 6662; Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(c), 103 Stat. 2106, 2339. Section 6662 applies to petitioners' 1989 income tax return. Under section 6662, a 20-percent penalty is imposed on the portion of the underpayment attributable to various factors, including negligence and substantial understatement of income tax. See Ypsilantis v. Commissioner, T.C. Memo. 1992-644. Under section 6662(b)(2), a 20-percent penalty is imposed on the portion of the underpayment attributable to a substantial understatement of income tax. A substantial understatement exists if for any taxable year the amount of the understatement of tax exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year, or $ 5,000. Sec. 6662(d)(1)(A); see Peterman v. Commissioner, T.C. Memo. 1993-129. We conclude that petitioners are liable for this penalty because their understatement of tax ($ 6,281) exceeded both 10 percent of the *429 tax required to be shown on their return ($ 6,281) and $ 5,000, and no exceptions apply. Since the section 6662(a) penalty applies because of petitioners' substantial understatement, we need not decide if petitioners were negligent for 1989 for purposes of section 6662(b)(1). Decision will be entered under Rule 155.